W. S. BALES and J. L. BALES, Contestants, Appellants, v. SARAH E. BALES, JAMES G. BALES and W. J. MURRAY, Proponents, Appellees.

**Wills:** TESTAMENTARY CAPACITY. One who possesses a mind capable of
1 exercising judgment, reason and deliberation, and of weighing the consequences of his act to a reasonable degree, and the effect of his act upon his estate and family, is competent to make a will; it is not necessary that he should have sufficient capacity to do business generally or to engage in difficult and intricate matters.

**Same:** EVIDENCE. In determining testamentary capacity it is proper
2 to inquire into the relationship of the parties, and ascertain whether the testator has been indifferent or forgetful of those who are fairly entitled to the recognition of a reasonable and rational mind, in making a disposition of his property. The evidence in this case shows a recognition by the testator of those claims upon his bounty which a man of ordinary intelligence and judgment would naturally recognize.

**Same:** OPINION EVIDENCE. Before a witness is entitled to give his
3 opinion as to the ultimate fact of testamentary capacity he must detail the facts within his knowledge upon which the opinion is based; and even then his opinion is not conclusive. In the absence of a showing of peculiar acts and conduct indicating unsoundness of mind his opinion is entitled to no weight. The evidence of unsoundness of mind in the instant case was based upon physical weakness, but in all business transactions the witness freely admitted that testator seemed rational and capable of transacting the business in hand.

**Trial:** DIRECTION OF VERDICT: WILL CONTEST: EVIDENCE. It is not
4 the duty of the court to submit a cause to the jury because there is some evidence introduced by the party having the burden of proof, unless of such a character as to warrant a verdict in favor of the party offering it which will stand: and a motion to direct a verdict should be sustained when from a consideration of all the

evidence it clearly appears that a verdict for the party having the burden would have to be set aside if returned in his favor; but the party against whom the ruling is made is entitled to have all the evidence in his favor considered in its most favorable light. The evidence is held insufficient when thus construed to support a verdict for contestants.

*Appeal from Hardin District Court.*—HON. R. M. WRIGHT, Judge.

MONDAY, FEBRUARY 23, 1914.

WILL contested on the ground that the same was procured by undue influence, and that the testator, at the time of making the will, did not have testamentary capacity. Verdict for proponents. Contestants appeal.—*Affirmed.*

*E. P. Hudson, Aymer D. Davis,* and *E. P. Andrews,* for appellants.

*Lundy, Wood & Baskerville, B. P. Birdsall,* and *Kenyon, Kelleher & O'Connor,* for appellees.

GAYNOR, J.—On the 12th day of October, 1907, J. H. Bales, resident of Hardin county, executed his last will and testament in which, after providing for the payment of his debts and funeral expenses, appears the following provisions:

II. I give, grant, bequeath and devise unto my wife, Sarah E. Bales, in lieu of dower, the one-half in value of all the property belonging to my estate, real, personal, and mixed, of which I shall die seised and give unto her the right to select from my estate what particular property shall vest in her by virtue of this bequest..

III. I give and bequeath unto James G. Bales, being the boy raised by me and now a resident of Hardin county, Iowa, the sum of ten thousand dollars and direct that said sum shall draw interest at the rate of four per cent. per annum from the time of the admission of this will to probate until the same is paid to the said James G. Bales, and direct that said sum shall be paid out of my estate by my executors within

two years from and after the time of the appointment and confirmation of such appointment of my executors, and further that such payment shall be made as soon as the same can be done without embarrassment to the administration of my estate by my executors.

IV.   I give, grant and bequeath unto W. J. Murray, of Eldora, Iowa, in trust, as trustee only, the rest and residue of my estate with full authority and power upon the part of the said W. J. Murray to invest and reinvest the said portion of my said estate as he, the said W. J. Murray may think advisable from time to time and shall deem for the benefit of the said trust estate and direct that the said trustee shall, from time to time pay over to my said wife at intervals of not less than one year, the net income derived from the said portion of the said estate during the natural life of the said Sarah E. Bales, and I authorize and empower the said W. J. Murray, if by him deemed to be to the best interest of the said trust estate to make sale of any portion of the said estate which shall come into his possession by virtue of this bequest without first making application for authority therefor to the court.

V.   At the time of the death and departure from this life of my wife, Sarah E. Bales, I direct that there shall be paid out of. the residue of the said trust estate by my said trustee, W. J. Murray, the sum of five hundred dollars, to Lula S. Trout, daughter of B. B. and Jennie Trout, and one thousand dollars to Henry Bales, my nephew, a son of John L. Bales.

VI.   I further direct that after the payment of the said two legacies provided for in the last preceding paragraph of this will that the residue and remainder of said trust estate shall vest as follows:   The one-third to become the property of the said James G. Bales referred to in the third paragraph of this will; one-third to my friend W. J. Murray, and the remaining one-third to be equally divided between my two brothers, John L. Bales and W. S. Bales, and in case of death of either of the said John L. Bales or W. S. Bales prior to said distribution, then and in that case, the portion of the estate which should have gone to either of the said parties, John L. Bales or W. S. Bales, shall be paid to the legal heirs of the party whose death has thus occurred prior to such distribution.

VII.   Finally I nominate and appoint as executors of this

my last will and testament, my wife, Sarah E. Bales, and my friend W. J. Murray, and ask that such nomination be confirmed by the court at the time this instrument is admitted to probate and that the executrix and executor shall not be required to give bonds in excess of the sum of five thousand dollars.

On the 19th day of December, 1911, the said J. H. Bales departed this life. On the 21st day of December, 1911, the foregoing instrument was filed with the clerk of the district court of Hardin county as the last will and testament of the said Bales. On the 19th day of January, 1912, the appellants herein, W. S. Bales and J. L. Bales, brothers of the testator, filed written objections to the probate of the will, urging: First. That the said J. H. Bales was not, at the time of the execution of the said instrument, of sound and disposing mind, but was incapable of making a will. Second. That the said will was procured and executed by fraud, duress, and undue influence exercised over him by Sarah C. Bales, James G. Bales, and W. J. Murray. A hearing was had on the issue at the March term of the district court of Hardin county. At the conclusion of all the testimony, on the motion of proponents, the jury was instructed to bring in a verdict in favor of proponents, and against contestants, and thereupon, an order was made by the court admitting said will to probate, and the same was duly probated as the last will and testament of the said Bales. From this order, contestants W. S. Bales and J. L. Bales appeal.

There was no evidence of any undue influence, exercised over the testator by the parties charged, which induced or provoked, or secured in any way, the making of the will in question, or that can be said to have controlled, or even directed, the mind of the testator in the disposition of his property as therein set out. We are therefore only concerned with the first proposition presented by contestants, to wit, Was J. H. Bales, at the time of the execution of the instrument, of sound and disposing mind and capable of making a will?

The law, as uniformly announced by this court is that a person is of sound mind who has full, intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons he desires should be recipients of his bounty, and the capacity to recollect and comprehend the nature of the claims of those who are excluded from participating in his bounty; but it is not necessary that he should have sufficient capacity to make contracts and do business generally, nor to engage in complex or intricate matters. In other words, it is said a party is competent to make a valid will who possesses a mind capable of exercising judgment, reason, and deliberation, and capable of weighing the consequences of his will to a reasonable degree, and the effect of it upon his estate and family.

1. WILLS: testamentary capacity.

It is proper, therefore, in determining the question herein under consideration, for us to examine somewhat into the relationship of the parties who are the subjects of his bounty, and to see whether or not therein lies any evidence of indifference to, or forgetfulness of, those who would naturally come into the mind of a reasonable and rational person as the ones fairly entitled to recognition and thoughtful consideration in making a disposition of his property. Upon this question see *Stutsman v. Sharpless,* 125 Iowa, 335; *In re Will Wharton,* 132 Iowa, 714; *Hardenburg v. Hardenburg,* 133 Iowa, 1.

2. SAME: evidence.

It appears from the record that J. H. Bales had no children. The record discloses that he entertained a high regard and a tender love for his wife; that he often, during his lifetime, spoke of her as having been of great assistance to him in securing his fortune, and that he intended to make ample provision for her. In the will this thought is exemplified and emphasized, and, as a good man should, he has made ample provision for her future. In this, there is no evidence of forgetfulness, nor indifference to the tie which had bound

him to her during the long years of their married life. It would seem to us to be an intelligent recognition and fulfillment of an intent long entertained by him and faithfully executed.

The boy, James G. Bales, seems to have been next in his consideration. To him a large bequest was made, and why? The record shows .that this boy, commonly called Jimmie, was born in Hardin county; that his father died when he was eighteen months old; that he came to live with J. H. Bales, when he was three years old, and continued to so live until his marriage; that he went through high school in Eldora, the home of the testator, and graduated in 1903. Then he went to Penn College one year. He came back to Eldora and worked in a hardware store for a time, and then went into a store in New Providence, purchased by J. H. Bales; that he became interested in that store in 1905. On his twenty-first birthday testator gave him a one-eighth interest in the hardware stock, and also one-eighth interest in New Providence Bank, the only consideration there being $1, love, and affection; that the interest at that time was valued at $1,000; that he continued in the hardware business at New Providence until 1908, until the stock was disposed of; that at the time he was five years old he took the name of Bales, and has ever since been known by that name. It appears that the relationship between Mr. Bales and Jimmie, during all the years that he resided with 'Mr. Bales, was substantially that of father and son; that in addressing Mr. Bales he called him father. As early as 1905, in conversation with one J. C. Cox, who was a witness in this case, he said that they were urging him to give money to Penn College, but he did not know what he would do about it. ''I expect my wife will have the majority of my property, at least during her life, and we consider Jimmie very much as if he were our own boy.'' At other times he said Jimmie was a good boy and had never disobeyed him, and he expected to see that he was comfortably fixed, and we gather from the record that he was very fond of

Jimmie, and had a great interest in his welfare, and that this continued up to the very time of, and after, the making of the will in question.

As to the other beneficiary, the record discloses that he also was born in Eldora; that he had known Mr. Bales since he was a small boy; that he went to work for Mr. Bales in 1892 in the bank; that he did chores for him before that time; that in the spring of 1892 he went to Ames with the expectation of starting to school there, to work his way through; that on his return Mr. Bales asked him to work for him; that he gave up the school, and from that time continued with Mr. Bales; that he worked in the bank as a sort of errand boy, learning the bookwork, in the meantime familiarizing himself with the work until he was advanced to the position of assistant cashier in 1895. In 1896 he was elected cashier, and remained as such until 1906, when he was elected vice president; that Mr. Bales was president of this bank from the time it was organized until July, 1908; that during the twenty years he was with Mr. Bales about the bank he frequently attended private business for him; that there was never any change in their relationship to each other; that in speaking of Mr. Murray, he said: "I don't know that I could think any more of him if he were my own son. I think so much of him and I expect to remember him when I get through with my property." On one occasion he said Murray deserved a good deal of credit in the way the business had succeeded, and he felt sometimes as though he had underpaid Murray for his services. In conversation with one J. C. Armstrong, in the spring of 1907, in speaking of both Jimmie and Murray, he said: "I have made provision for Jimmie. We raised him, but he is married, now, and I feel that we ought to make more ample provision for him." He said that he had taken Murray out of school, and he had been with him ever since.

One Dr. Koeneman, as a witness, stated: "I had a conversation with Mr. Bales some time prior to October 12, 1907,

on a train going up into Minnesota in which he gave me his personal history. He spoke of his early life and his business. Spoke of Mr. Murray. Said he had taken him when a boy, and took great pride in his business ability, and spoke in praise of the work he had done for him in the bank.''

It does not appear that the contestants herein, during all the years of testator's struggle in the world of business, were in any way associated with him, or that they had any claims upon his bounty except those which might naturally be expected from the ties of blood. It appears that at one time one of these contestants contemplated caring for the mother of J. H. Bales, of whom testator seems to have been very fond; that at the time he made some suggestion to the effect that he would remember him in the disposition of his property. But it seems from the record that the mother never resided with this son after he was married in 1884. Thereafter she continued to live with, and was cared for, by J. H. Bales until her death. This appears to be the only fact upon which he bases his claim to special recognition.

It appears, further, that the visits between the brothers were only occasional, about a year apart. The father of these boys died in 1880, when the contestant, W. S. Bales, was about twenty years of age; that the mother died in 1896; that this W. S. Bales was married in 1884; that the mother never lived with him after he was married. J. L. Bales, the other contestant, was not a witness on the trial.

Upon this branch of the case, we find nothing in the will, nothing in the disposition made of the property, that would suggest that it was not made by the testator in a full recognition of the obligation, if any, which he owed in the disposition of his property, to those fairly recognized by him as entitled to his bounty. It would rather appear that, in the disposition, he recognized those ties and claims and obligations which a man of ordinary intelligence and rational judgment would have recognized as binding upon him. He gave the property to those to whom he had every reason to be

grateful; the wife; the boy whom he raised with the affection of a father; the man whom he had taken into his confidence, and who had helped him to success. There is no indication of unsoundness of mind in the disposition of the property when looked at from this viewpoint.

But it is contended that, notwithstanding the fact that the provisions of the will may seem to be just and equitable and to indicate the action of a normal mind, yet that the evidence which has been offered was such that it was a question for the jury as to whether or not he was, in fact, in possession of testamentary capacity. The evidence upon this proposition is voluminous. No good purpose would be served in setting it out in detail. We have examined the record carefully, both as it appears in the abstract and amendment to abstract, and we are satisfied that, as to the ultimate fact which the evidence tended to prove, there is very little difference between the witnesses.

The opinion of witnesses is not controlling when the mind is searching for the ultimate fact. The opinion of witnesses, whether they be expert or non-expert, as to the ulti-

3. SAME: opinion evidence. mate fact of testamentary capacity, while entitled to be weighed and considered by the court, is not conclusive upon the issue. The mere opinion of a non-expert witness, based upon no fact from which even an inference of unsoundness could be drawn, is not entitled to any weight. Before a non-expert witness is entitled to give an opinion as to mental soundness, he must be able to state, must state, facts within his knowledge or observation which tend to show the party to be of unsound mind. Before he is entitled to express an opinion upon this issue, he must state peculiar acts or conduct which indicate unsoundness of mind.

Every nonexpert witness called, who testified as to the mental condition of the testator after and prior to the time of the making of the will, predicated his conclusion that he was not of sound mind almost entirely upon the physical condition of Mr. Bales as it appeared to them. The physical con-

ditions mainly relied on were physical weakness, expression of the countenance, the appearance of the eye, and slowness of speech, and remarks made by Mr. Bales touching his physical health; that he seemed to be failing in health; that he was not as quick in his movements; that he was slower in thought, but every witness, when examined touching any business transaction with Mr. Bales, freely admitted that he seemed perfectly rational and capable of transacting the business in hand. This as late as September 1, 1907.

Take for example, the testimony of Elkanah Reece, who testified on the part of proponents:

In the spring of 1907 I spoke to Mr. Bales about getting a loan from the Penn College Endowment Fund. I didn't want the loan until September. He said he thought he could get it all right, but they didn't have the money on hand at the time. But he said: 'I guess I can fix it. I can fix it some way. I just don't see how.' A minute afterwards he said: 'Oh, yes, I see how. We can just take some money out of the bank and furnish you the amount you want, and when the endowment fund comes in, we can replace it in the bank again. I don't see business as readily as I once did.' He said he couldn't think as quick as he once did. Between that and the last of September, 1907, I saw him again, and he said, 'We have the money that you want.' On the 30th of September, I went up to finish the loan. I found Mr. Bales down home. I told him I was ready to get the loan. He said: 'I am not going to the bank now. Warran Rathbone will attend to that for you.' I think I noticed a difference in his eye. There was a lack of the same ability in his expression. Speech was not prompt, somewhat hesitant. We talked about the loan. He said that he had explained the matter to Mr. Rathbone. The loan was for $5,200, to be secured by a mortgage on a farm of three hundred acres. I discussed the terms of the loan with him. He told me he could furnish me the loan at 5 per cent. interest for ten years. The loan, the land, the rate of interest, and the terms were discussed between us. When I went to the bank, I found Mr. Rathbone had been apprised by Mr. Bales of the terms and conditions of the loan, and I closed it up satisfactorily with him; just exactly as Mr. Bales had agreed.

George B. Spears testified:

I had a business transaction with Bales in August, 1907. Traded my house for a farm in Kansas in which he was interested. On my way home with him one day I told him I was going to Kansas to look at a farm with Charlie Ryan. He said he had a farm there, too, not far from the place I was going, and said: 'If you don't make a deal, I would like to have you see this farm. I believe we could make a deal. Mr. Ryan knows about the farm, and I will see him and have him show it to you.' September 1, 1907, I had another conversation with him about it. In the meantime I had been to Kansas. He said, 'Well, you didn't make the trade?' I said, 'No.' He asked if I had looked his farm over and I said I had, but I couldn't quite make the deal. 'Well,' he said, 'come into the back room of the bank. Maybe we can make it yet.' I told him I had made an offer to Ryan on Bales' land, and would stand by it. We talked about it some time, and I afterwards concluded the deal and traded my home for the Kansas land.

J. W. Peisen testified:

I had a transaction with Bales about the 8th of September, 1907, at his bank. At the time the panic broke, I had made a contract for 240 acres of land in Minnesota, and had paid $500 on the contract, and the financial situation frightened me a little. I went to see Mr. Bales about arranging for meeting the proposition, and being prepared to close it on March 1st, that being the date of the settlement on the contract. I went over the facts with him, and he assured me he would take care of me up to $8,000. He said he would furnish the money for $8,000 above the first mortgage, or he might prefer to take up the first mortgage and carry the $8,000. However, he advised me to dispose of the contract if I could. I had done business with him before, and had taken his advice. I noticed no change in his manner of doing business at that time.

J. A. Johnson testified that he was a depositor in the bank and had done business with Bales.

I talked with him in October, 1907. Saw him twice on that day in the bank. I wanted to get a man's note renewed. He looked up the record and saw that I had two more notes against the party, and he advised me not to renew it because it was past due. He advised me to get this note paid before the other was renewed. I notified the party that the note could not be renewed, and he paid me the money. I had another conversation with him about the 1st of November. I had to make up some money for the International Harvester Company, and I took the notes over to the bank, notes of farmers. Mr. Bales suggested the best thing to do was to go to Cedar Falls and see if I couldn't turn in the notes as cash to the company. I went to Cedar Falls. I had a talk with him when I returned. I got the notes together, and he picked out what notes he wanted. Short-time notes, and the long-time notes I sent to Cedar Falls. He discounted about $1,800 of these notes. He gave me credit in the bank for the notes he discounted. He said he could handle the short notes the best at that time. He told me I should be pretty careful how I handled paper; to get as much cash down as possible, and to take short-time notes. He said money was getting pretty short in the East, and to be very careful in business. I noticed no change in his manner of transacting business.

Charles O. Ryan testified:

I talked with Bales about the trade of the Kansas land in 1907 and about other land. I had a deal with him in July, 1907, and he renewed a loan for me of $3,000. Spent a half a day with him on November 5, 1907. He talked about the bank's shutting down, the Elzig suit, and the Wisner suit. He spoke of being a witness in the Wisner suit. This was before he went to Colfax. He talked the same as he always talked to me. I thought he was sick, but observed no change in his mental condition.

J. C. Armstrong, called as a witness, testified as to business transactions with Mr. Bales during the summer and fall of 1907:

That Bales visited Jimmie at New Providence, and was in the hardware store in which Jimmie was a partner, and

he said he was a little uneasy about Jimmie's wife's health, and he believed he better dispose of the hardware stock; that he contemplated going South, and he wanted Jimmie and his wife to go with him. He offered me ample time to get a partner. He gave me sixty days. About the 1st of October, I came to Eldora and had a talk with Bales. Bales and Jimmie took my share of the stock about November 15, 1907. He ran over the stock and made an estimate. He advised me to be careful in buying stock; to know where the money was coming from to pay for it. I saw Mr. Bales on the morning of September 2, 1907. I saw him when he drove into town. He asked me if I could let Jimmie go with him to the farm. He said his stomach was bothering him; that he wasn't feeling very good. In about half an hour, they drove over to the farm. He spoke of having eaten a hearty breakfast, that they had something that suited him, and that he ate too much. We talked about Jimmie. He said he was well satisfied with Jimmie's progress in business. During the whole time, I observed no change in his manner of talking or doing business.

Most of the testimony of the nonexpert witnesses, touching the mental condition of Mr. Bales, relates to a time several months subsequent to the making of this will. However, all the facts stated on which they predicate mental incapacity, disclose physical weakness; appearance apparently superinduced by physical weakness, rather than by mental unsoundness. We do not pretend to set out all the testimony given by nonexperts, but have set out herein substantially the testimony of those with whom Mr. Bales transacted business at or about the time of the making of the will, and from this it is made to appear that, however much his physical condition may have been impaired, his mental vigor was not thereby seriously abated up to, and at the time of, the making of the will.

It appears that prior to October, 1907, and some time in February, 1905, Judge Albrook prepared a will for the testator, in which he gave to Jimmie (named in the will in controversy) $5,000 at the time of his death, and $5,000 on the death of Mrs. Bales, and gave to the nephew named in the

will $500; the will in other respects being substantially as the will now under consideration; that at the time the will in question was executed he came to Judge Albrook, spoke about the will previously prepared, and said he had made up his mind to change it in some respects, and wanted to know if it could be done by amendment or addition to it.

I asked him what changes he proposed to make. He said he intended to change it so that Jimmie would not have to wait until Mrs. Bales' death to get the second $5,000; that he wanted Jimmie to have $10;000 at the time of the settlement of the estate; that he wanted to give his nephew $1,000 in place of $500. I said to him then: 'This can be done by making a codicil, but I don't like a codicil very well. Sometimes it leads to controversy. Your will is not very long, and you might have it re-written.' He then went out of the office and afterwards came back with the will in question written out in his own handwriting, and submitted it to me and said, 'What do you think of that?' I looked it over and said I thought it was all right. 'Well,' he said, 'it don't look very well. I think you better have the girl copy it.' It was then turned over to one of the girls in the office and copied. He came afterwards and took it out. At the time he made the change in his will, October, 1907, I saw the will he had made, in February, 1905, and I saw the changes which were made by the will of October, 1907.

It appears that Mr. Bales, for some time after making the will, was president and director of the bank and active in its management; that he was guardian of the Wisner estate, acted as treasurer of the board of trustees of Penn College, and up to the time of the financial crisis of 1907 he talked intelligently about the condition of his bank, and gave reasons why he believed that the bank would not be financially embarrassed by the panic; that he attended a meeting of the bankers of Hardin county in the latter part of October, or the first part of November, 1907, and took part in the discussion. This meeting was called for the purpose of determining what the bankers of Hardin county should

do in the event the panic continued; that as late as November 24, 1907, he wrote letters touching the business which he had left behind, and directed his attorneys as to the conduct of certain litigation that was then in progress in which he was interested. These letters are too numerous to even set out extracts, but they all indicate a clear understanding of his relationship to the business which he had left behind.

Expert witnesses were called to testify as to the mental condition of the testator. One Dr. Getman testified that he had seen him frequently upon the streets; that he observed him; noticed his health was failing in 1906 and 1907; that Bales often passed him on the street without speaking to him. Witness thought he did not recognize him. As far back as 1907 he noticed that he was nervous and in ill health, and did not converse with his usual ability. This was prior to the making of the will; that he met him afterwards at Colfax in March, 1908; that in conversation, he did not pursue the subject to the end, but frequently changed from one subject to another. However, he testified that he knew he did business in 1907, but he had no business transactions with him, and could not say whether or not he had sufficient mind to comprehend his property, recognize his family, or had correlative ideas between his property and property rights and his family and family rights; that he never talked with him on these subjects; that he could not say whether he had sufficient mental capacity to have an understanding of his property and its value, and yet he testified that, in his judgment, he was unsound of mind on October 12, 1907.

Dr. Turner, with whom testator stayed at Colfax, said he met Bales first November 14, 1907, at the sanitarium. Stayed there until about February 21st, and was treated. His trouble was arterio sclerosis. When he came there, he was physically and mentally worn out. He was irritable, restless, and forgetful. He would sometimes lose himself and forget where he was going and where he belonged. From the time he came until he left he was gradually growing

worse. He did not talk much while there. He was rather secluded. That is a characteristic of the disease. ''I think when he came there, he was of unsound mind. He would eat his meals hurriedly and go back to his room. His wife would sit for hours entertaining him playing games. His wife told me his business was worrying him. He was having a lawsuit about that time in regard to a horse, and there was the settling of some estate that was worrying him. I took Mr. Bales on December 4th to Des Moines to Dr. Hill for consultation.'' On this he predicates the opinion that he was of unsound mind. On cross-examination, he said:

Mr. Bales told me he was having some trouble about a lawsuit. He was worrying about it naturally. I was not surprised that he got turned around in Colfax. Many people do on account of the way it is laid out. He paid me for my services by check signed by himself. I do not remember any statement made to me when Mr. Bales was there that was not a rational statement. He did not like the place. Mr. James Bales and his wife were down to see him several times. Mr. Murray and Judge Albrook were down to see him on business. I told Judge Albrook that Bales was able to talk with him on a business matter, and would be able to go over any business proposition. I thought he was able to do business to a certain extent. I think he was able to do business at the time to the extent of realizing property and its value. This was about the 1st of April, 1908. Unsoundness of mind is in various degrees. It may be slight, or such as disqualifies one from doing business. The subject may be able to transact the ordinary affairs of life. I think at that time he could comprehend ordinary business transactions.

Then he was asked these questions, and made the following answers:

Q. Assume that Mr. Bales on October 12, 1907, had before him an instrument in writing, one clause of which read as follows: 'I give and bequeath unto James G. Bales, being the boy raised by me and now a resident of Hardin county, Iowa, the sum of $5,000.00.' Do you think from the examination of Mr. Bales that he would know at the time who James G. Bales

was? A. I think so. Q. And do you think that if he had that instrument before him he would know that James G. Bales was the boy that was raised by him and was a resident of Hardin county? A. I think so. Q. Do you think he would have mind enough at that time to know or to rationally conclude whether he wanted to make it $5,000 or $10,000? A. Yes. And with the matter before him—I think he would know whether he wanted to make a bequest of $5,000 or $10,000, and if he had the instrument before him, one clause of which read as follows: 'At the time of the death and departure from this life of my said wife, Sarah E. Bales, I direct that there shall be paid out of the residue of the said trust estate by my said trustee, W. J. Murray, the sum of $500.00 to Lula S. Trout, daughter of B. B. and Jennie Trout and $500.00 to Henry Bales, son of John L. Bales, I think he would have sufficient capacity of mind to know who Henry Bales was, and would know who John L. Bales was, and he would know whether he wanted to give to Henry Bales, $500 or $1,000, and I think he would have capacity also to know what the difference was between the payment of a sum of money at his death and the payment of a sum of money at the time of his wife's death.

Dr. Hill, called as an expert witness for contestants, said: "I met Bales in my office on December 4, 1907. He was in my office about one hour." He was then asked this question, "Now you may state what he told you at the time in relation to himself and his past history." To which the doctor made the following answer:

He said that he was born in Tennessee, and that he lived there a few years, and that he had been living in Iowa most of his life, and for, I think he said, thirty-three years in Hardin county. He had been a merchant, he had been a county treasurer, and he had been in a bank for fifteen years. And I inquired about his father and mother, and he said that his father died at fifty-seven of apoplexy, and his mother died at seventy-five of old age, and that he had no sisters, but two brothers, one, he said, was fifty-seven, and the other sixty-nine years old. He said he had a wife to whom he had been married thirty-three years, but no children. He said he had taken a son to bring up, and that he had been in the army,

and went on, I think, he said he had typhoid fever when he was twelve years old, but got over it, and it didn't do him any permanent harm, that he had not been a rugged man, but that he had never been sick in bed very much, and the rest of the record, as I remember it, was that the first time that he became alarmed about his present condition for which he consulted me was when he went over to New Providence to show a man a farm, which was either in September, 1906, or 1907, and that he got very tired, and that he got confused, and didn't realize where he was, or what the people said to him. He said that he came in in about half an hour; that he rested a few hours at the home of his son, I believe it was, and lay down there, and lay there in the day; probably in the evening this son brought him back to New Providence, or to this town, Eldora. After his return, he stayed at home. I think he said he remained in bed some days, and he said he had been tired and weak ever since, and that he had heat in his head, and felt a kind of a fullness in his forehead, and that he sometimes had a dizzy feeling. He thought he had some trouble with his heart; that he never had much trouble about his sleeping. I understood him to say he always was a good sleeper. He said, I believe, that he had given up business, and was taking a rest at Colfax, where he had been for three weeks—(all of which the record shows to be substantially correct). From his description of the case it seemed like the history of neurasthenia, or nervous prostration, or brain fag, or a tired condition of the mind, and from this, with an examination of the heart and pulse, I concluded he was suffering from arterio sclerosis. The development of this disease is very gradual. It is a wearing out of the arteries. It is common to people who live to be very old. It is brought on prematurely by using alcohol or tobacco. The progress of the disease would be gradual for many years. Its effect on the brain is to weaken it and to interfere with its functions. Its effect is to destroy the brain itself and the brain tissue. It is gradual, and finally results in softening of the brain which terminates life.

Thereupon he was asked a long hypothetical question and answered that he believed Bales was of unsound mind. Dr. Hill further testified:

People may suffer with the disease, and it is impossible to say in a given case that the mind is diseased or affected until there is some manifestation from the mind itself. I observed that Mr. Bales was an invalid; that he had disease in the circulatory system, in his arteries and heart, and yet that disease of the arteries and heart would not produce mental derangement. The disease of the arteries and heart may have been in progress for years without producing any serious effect upon the mind. So that up to the time that a point is reached in the progress of the disease, that the mind has become seriously affected, the patient is able to comprehend what he is doing. When he visited me, Mr. Bales comprehended what I asked him, he gave me the members of his family, the age of his father and mother when they died, and the disease they died of; the names of his brothers and sisters, and their and his personal history from birth to date; he recalled them all, and, so far as I know, correctly. I didn't ask him anything about his property. I got that from Dr. Turner.

The rule governing the court in the disposition of a motion for a directed verdict at the close of the evidence is that it is not the duty of the court to submit the case to the jury because there is some evidence introduced by the party having the burden of proof, unless that evidence is of such a character that it would warrant the jury in finding a verdict in favor of the party introducing such evidence. Before the question is left to the jury for its determination, the preliminary question for the court is whether there is any evidence to support the verdict, and, if so, whether upon such evidence the jury can find a verdict for the party producing it that will stand.

4. TRIAL: direction of verdict: will contest: evidence.

It is said in *Pleasants v. Fant*, 22 Wall. 120 (22 L. Ed. 780):

It is the duty of a court, in its relations to the jury, to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful right in the conduct of a trial. This is done by making plain to

them the issues they are to try, by admitting only such evidence as is proper in these issues, and rejecting all else, by instructing them in the rules of law by which that evidence is to be examined and applied, and finally, when necessary, by setting aside a verdict which is unsupported by evidence or contrary to law. In the discharge of this duty it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor.

It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence in support of the case, but it is now settled that the question for the judge is, not whether there is literally no evidence, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established. This rule has been adopted and followed in this state for many years.

In *Meyer v. Houck*, 85 Iowa, 327, this court said: "It will be seen from what we have cited that the whole turn of legal thought in this country and in England is contrary to the rule of practice which requires a court to go on for several days with the trial of the case to a jury when the verdict must, in the end, be either for the defendant, or be set aside if for the plaintiff. . . . Our conclusion is that when a motion is made to direct a verdict, the trial judge should sustain the motion when, considering all of the evidence, it clearly appears to him that it would be his duty to set aside a verdict if found in favor of the party upon whom rests the burden of proof. . . . He has no right to insist that the trial of the cause be continued as a mere idle form, or a mere experiment, that he may have the gratification of securing a verdict which must be set aside."

We recognize the rule that the party against whom the ruling is made is entitled to have all the evidence in his favor considered in its most favorable light. In the consideration of this case we have done this, and find, upon the whole record,

that a verdict for these contestants would not have support in the evidence sufficient to maintain a verdict in their favor based thereon.

Some complaint is made of the rulings of the court on the introduction of evidence. We have examined these points with care, and find no reversible error committed by the court in this respect. The objections were sustained by the court in many instances from the manner in which the question was propounded, rather than because of the substantive facts sought to be proved. This is very marked in the examination of the nonexpert witnesses, in which it was sought to be shown, by the mere conclusion of the witness, substantive facts on which to predicate an opinion on the unsoundness of the testator's mind, and this is rightfully excluded.

We find no error, and the case is *Affirmed*.

LADD, C. J., and DEEMER and WITHROW, JJ., concur.