EFFIE MORES LEONARD et al., Appellants, v. BERTHA S. SHANE et al., Appellees.

DEEDS: Validity, Etc.—Mental Incompetency—Grantor's Incapacity for Business Generally. *Mental capacity to dispose of property may outlive mental capacity to do business generally.* Evidence reviewed, and held that the deed of an aged grantor, evidently executed with the rational and intelligent purpose of correcting the manifest inequalities of the will of grantor's husband, was not invalid by reason of grantor's mental incapacity.

*Appeal from Bremer District Court—C. H.* KELLEY, Judge.

FEBRUARY 16, 1918.

ACTION in equity to set aside a deed for the convey-ance of real estate. Upon trial to the court, the petition was dismissed, and the plaintiffs appeal. The material facts are stated in the opinion.—*Affirmed.*

*Sager & Sweet,* for appellants.

*Pickett, Swisher & Farwell,* for appellees.

WEAVER, J.—The plaintiffs are children of one Jane Mores, who died intestate in Bremer County, September 7, 1914. The principal defendant, Bertha S. Shane, is also the child of the said Jane Mores, born 'to her of a former marriage. In her lifetime, said deceased acquired title to the four lots in the city of Waverly, which prop-erty she held and occupied as her homestead. Her last husband, A. S. Mores, died in the year 1903, and she did not again marry. On March 19, 1912, deceased executed a deed conveying her homestead property to Mrs. Shane, and deposited it in a bank, with instructions to deliver it at her death to the grantee. In compliance with this in-struction, the deed was delivered to Mrs. Shane after the death of her mother. Within two weeks thereafter, this ac-tion was begun to cancel the deed, on the grounds: (1) That the same was executed under and by reason of the fraud perpetrated and the undue influence exercised by the grantee over the grantor; (2) that, at the time the deed was made, the grantor was so unsound of mind as to be incapable of transacting such business, and could not understand or intelligently comprehend the nature and ef-fect of her act in thus conveying away the title to her property; and (3) that said deed was never delivered to the grantee, and therefore the attempted conveyance never became effective. The defendant admits the conveyance by deed to herself from her mother, alleges its good and sufficient delivery, and denies the allegations of fraud and

undue influence on her part, as well as the alleged mental unsoundness of the grantor. The court, having heard the evidence, found that the plaintiffs had failed to maintain their claim by a preponderance of the evidence, and entered a decree for the defendant.

There is no serious question raised by counsel upon the law applicable to cases of this nature, and appellants' one proposition upon which they ask a reversal below is that the evidence clearly and conclusively shows them to be entitled to the relief prayed for.

So far as the case set out in the petition is based upon the allegation of fraud and undue influence, and upon the alleged non-delivery of the deed, it may be said at the outset that there is no evidence whatever. Indeed, we do not understand counsel as contending otherwise; but it is urged with much earnestness that the testimony does conclusively establish the fact that Jane Mores, at the date of the deed to her daughter, was of unsound mind, and incapable of making a valid conveyance. It is not to be denied that there is much evidence offered by plaintiffs having a legitimate tendency to show that the grantor had reached an advanced age, had become, to a considerable degree, forgetful, childish, and querulous, and in many ways manifested the weakening effect of years upon her native strength of body and mind; and, had the case tried been one at law, and the jury had found for the plaintiffs upon this issue, we should, perhaps, decline to set aside or disturb its finding. But as an original question of fact, for trial here *de novo*, we are by no means convinced that the unsoundness of the grantor's mind to a degree which will invalidate her deed has been satisfactorily proven. There is no presumption that a person eighty-one years of age is incapable of transacting business. While great age may be a pertinent circumstance for the consideration of the court or jury, in connection with other proved facts bearing

on the question of mental competence, yet the burden remains upon the party alleging incompetence to establish it by the proof. Nor will a mere doubtful or shadowy preponderance of the evidence be accepted as sufficient to justify a decree setting aside the deed of a deceased grantor because of unsoundness of mind. The fact need not be proved beyond a reasonable doubt, but the preponderance in favor of such finding must be reasonably clear and satisfactory. Brought to this test, we are of the opinion that the case made by the appellants is not sustained by the evidence, and that the trial court properly dismissed the petition.

In the first place, there is nothing so unnatural or palpably unjust in the act of Mrs. Mores in making this deed to her daughter and depositing it with a third person to be delivered after her death as, in itself, to excite any suspicion or suggestion of mental incompetence on her part. In early life, she had married one Johnson, and become the mother of this daughter. While the daughter was still a young child, the mother contracted a second marriage with A. S. Mores, with whom she lived about fifty years. Of this marriage, seven children were born, six of whom survive both parents, and are plaintiffs in this action. The seventh child, a daughter, died in the mother's lifetime, leaving minor children, who are joined with Mrs. Shane as defendants. The appellee Mrs. Shane lived with her mother and stepfather until she married, at the age of nineteen years; and, so far as appears, performed the usual service of an eldest daughter in assisting her mother in the work of the household and care of the younger children. The stepfather and the mother appear to have been fairly prosperous, and to have accumulated property to such an extent that, when he died, Mores left an estate of the value of somewhere from $50,000 to $60,000. He left a will, providing a life estate for his widow in lieu of

dower, subject to which provision he left his entire estate in equal shares to the children of his marriage, except his son Jason, to whom he made a bequest of $1,000 only. He made no provision of any kind for Mrs. Shane. The widow elected to reject the devise in her favor, and take her statutory portion of the estate; and, while there is no direct evidence to that effect, the proved circumstances and her subsequent conduct justify the inference that she was largely influenced to make this decision and claim her legal share in the property by the failure of her husband to recognize Mrs. Shane in his will, and perhaps also by his discrimination against Jason,—inequalities which she could in this manner rectify, in some measure. Failing to agree with the plaintiffs herein upon the partition or division of the estate, she brought suit for partition, which resulted in her receiving the aggregate sum of $17,537.02, which sum included $3,500 for the estimated value of the homestead, which was set off to her. Later, and after the making of the deed in controversy, a guardian having been appointed for her property, there was collected for her from the estate an additional sum of $1,378.24, making her total distributive share $18,915.26. The failure of the mother to abide by the will of her husband was evidently the source of dissatisfaction, if not of bitterness, on the part of plaintiffs, or some of them. Moreover, for some reason not explained, and not necessary for the court to inquire into, there seems to have been, from an early date, a feeling of decided hostility on the part of the plaintiffs toward the half sister, the defendant, and there was no interchange of the ordinary civilities of family life between them. When Mrs. Shane was about to remove from the state, and called at the family home to bid her mother good-by, one or the plaintiffs excluded her from the home, and refused her permission to talk with her parent. The mother was well aware of the utter lack of

family affection between her eldest daughter, who appears not to have prospered financially, and her other children, who, subject only to her own right, had received all of her husband's estate; and if she sought from her own portion to provide for her first-born, who shall say that her act was not both sane and right?

It further appears in evidence that, on another occasion, she had given the appellee $500, and had turned over to her a certificate of deposit for $3,800, reserving to herself for life the interest accruing thereon. She had also given to her son Jason $1,000. When a guardian was appointed for her property, a year after the deed to appellee was made, there was found still in her possession a bank deposit of $1,027 and later collections were made to the amount of $1,958.36—all of which are included in the aggregate sum of her receipts from the estate, as hereinbefore stated. Except as the matter of her support had been aided by an allowance of $500 from the estate, her living expenses for about ten years after her husband's death must have been drawn from her share in the property left by her husband. During this time, she is also shown to have paid a special assessment of $671 for street paving; and if she expended anything for other taxes or repairs, or indulged in charitable giving or travel or other miscellaneous disbursements, they were doubtless all derived from the same source. When we consider, therefore, the unexpended amount found remaining by the guardian, together with her gifts to appellee and to Jason, it is quite clear that she had not been wasting her substance in riotious living. In the spring of 1913, one year after the making of the deed, Mrs. Mores was taken sick, and thereafter, her decline in physical and mental vigor became much more apparent; and plaintiffs, or some of them, procured the appointment of a guardian to care for her property. Up to the date of this sickness, it fairly appears

that she attended to her own business affairs with reasonable efficiency; and, taking the evidence as a whole, we discover no good reason to doubt that she retained an intelligent comprehension of the nature and extent of her property and property rights, and was capable of exercising a rational and intelligent choice in the selection of those members of her family who, for reasons of her own, she believed to be entitled to preference at her hands. The property she had was her own. In the fifty years of her married life, we may presume that she had done her share in contributing to the accumulation of the estate left by her husband, and the share set apart to her was not a mere gift or favor which imposed upon her any obligation to return or restore it to the beneficiaries named in his will. If she believed that the appellee and Jason had not been remembered suitably by her husband in distributing his estate, it was her right to substitute her own bounty, to make up in whole or in part for that which had been withheld by him. Her judgment in this respect may have been wrong, and her husband may have had valid reason for the discrimination shown; but the right to do as one may with one's own is not limited by any necessity that, in giving it away, he or she shall select the beneficiary whom others may think the most worthy of such favor. It is true, of course, that, if the mother were clearly shown to have been a mental incompetent at the date of the deed in controversy, her abstract right to convey away her property would avail the appellee nothing, for the sufficient reason that the grantor in such case would lack the capacity to exercise that right intelligently. Recognizing this principle, these appellants, as we have before noted, bring all their forces to bear in support of the proposition that the grantor was, in the physician's phrase, "a senile dement." That there is such a thing as senile dementia must be conceded. That, as the average person advances

in old age, he manifests in some degree a progressive weakening in some or all of his physical and mental powers, is likewise a fact of common observation, and that his deterioration or decay sometimes culminates in a state of complete and unquestionable incompetence, is not to be denied. These obvious truths have made the allegation of senile dementia the favorite and almost universal resort of those who seek to set aside or annul gifts, grants, or devises made by persons who have entered that vaguely defined period of life which we call old age. So much has this been the case that courts and juries are not infrequently asked to find that a person who, up to the last of his life, was in full charge and control of his own affairs, transacting business and caring for his own interests with a reasonable degree of intelligence, was, nevertheless, incompetent to execute a valid deed or make a valid gift or will, because he was a "senile dement." In proof of such claim, it is never difficult to find witnesses who remember that he was forgetful, or was absent-minded or childish; that he would repeat old stories; had become careless in matters of dress; that he sometimes failed to recognize a friend or acquaintance; that his eyesight and hearing had become impaired; and so on through the whole category of infirmities which usually and normally appear in those who have passed the zenith of life and wend their halting way to its sunset. Nor is there ever wanting the expert, ready to respond, to a hypothetical question embodying all these details, that one who manifests these varied symptoms is a "senile dement." Such answer may be scientifically correct, in the way in which the expert uses the phrase; but it is no less true, as a matter of law and of common observation and common sense, that the existence of these normal and usual accompaniments of age do not imply any lack of capacity to deal with one's own, or to make an intelligent disposition of property by grant, gift,

or devise. It may be true that the very entrance upon old age marks the beginning of loss or decay of mental power, and that from such moment such person suffers some degree of senile dementia; but the business, social, and political world is full of proof that the power to think intelligently, reason clearly, and perform intelligently, the ordinary functions of business life, may long survive the passing of youth and middle age. The law also recognizes the fact that the right of the old to control and dispose of their own property, and their right to the uncontrolled choice or selection of the persons to whom they will extend their bounty, are of peculiar value, and will be respected by the courts. It is elementary that capacity to exercise such right is not inconsistent with a very considerable degree of mental weakness, and it survives the capacity to buy and sell property and do business generally, so long as there remains the capacity to understand the nature and extent of one's estate and the effect thereon of his act, and the claims, if any, which others may have on one's remembrance in its distribution. *Sevening v. Smith,* 153 Iowa 639; *Gates v. Cole,* 137 Iowa 613, 618; *Hanrahan v. O'Toole,* 139 Iowa 229; *Nowlen v. Nowlen,* 122 Iowa 541; *In re Evan's Estate,* 114 Iowa 240; *Perkins v. Perkins,* 116 Iowa 253. In short, mere senile weakness, the normal and to be expected incident to advanced age, does not imply incapacity to make a valid gift, or other disposition of property. It is only when that weakness becomes so complete or so aggravated that its subject ceases to comprehend the nature and effect of the act that incapacitating dementia exists, in the legal sense of that term, whatever it may mean to the expert. Whether that line of demarcation has been reached in any given case depends necessarily on the circumstances disclosed by the evidence. In this case, aside from a few matters testified to by parties interested in the success of plaintiffs' case, there is little

or nothing in the record which necessarily tends to show the alleged incapacity of Mrs. Mores to make the conveyance which the court is asked to set aside; and, without in the least impugning the good faith of the plaintiffs, it must be said that the weight and value of their testimony is very materially impaired by its manifestations of the partisanship usually incident to litigation of this kind.

We are satisfied that the testimony is insufficient to sustain the plaintiffs' prayer for relief, and the decree dismissing the petition is, therefore,—*Affirmed.*

PRESTON, C. J., GAYNOR and STEVENS, JJ., concur.