In re Estate of Margaret Hollenbeck Ramsdell.

Lulu Deeter, Proponent, Appellant, v. Warren Case et al., Contestants, Appellees.

No. 41378.

October 25, 1932.

Rehearing Denied April 6, 1933.

Willett & Willett, and Gamble, Read & Howland, for appellant.

Willard F. Russell, and Charles E. Hughes, for appellees.

Albert, J.—A general view of the fact situation in this case shows that Margaret Hollenbeck Ramsdell and Francis H. Ramsdell were husband and wife. Francis Ramsdell had been married twice before his marriage to the deceased and for many years suffered from blindness. He was past ninety-four years of age at the time of his death on January 6, 1931. Margaret Ramsdell died January 19, 1931. She has no children and left surviving her as her heirs

a brother, Francis Marion Case, a sister, Mary Louise Duncan of Denver, and the children of a deceased sister, five in number, among whom is Lulu Deeter, the proponent of the will in controversy. Margaret Hollenbeck Ramsdell was past 81 years of age at the time of her death. This aged couple lived in Tama county all of the years of their married life.

The instrument in controversy (dated August 19, 1927), after providing for the payment of debts and funeral expenses, gave to the husband $1,000 in lieu of dower; to a brother, Francis Marion Case, $1,000; to his wife, $200 and to their children, $200 to be divided equally between them; to a sister, Mary Louise Duncan, $500; to Lulu Deeter, $1,000; to a sister-in-law, Ida Surface, $500; to Marguerite Scott, $200; to Geraldine Lucretia Scott, $200; to the Presbyterian Church of Tama, the sum of $100; to the Ladies' Aid Society of said church, $100; all to be paid out of the personal estate only. The will further provided:

"The rest and residue of my estate * * * to my beloved niece, Lulu Deeter, of Mt. Pleasant, Michigan. I desire that she shall care for me as long as I may live."

Lulu Deeter was named executrix under the will.

The contest instituted against the probate of this instrument is made by the children of Francis Marion Case. The major contention is that the evidence was not sufficient to take the case to the jury on the question of undue influence, nor was it sufficient to make a case for the jury on the question of the mental incapacity of the said Margaret Hollenbeck Ramsdell. These contentions necessarily require a review of the testimony in the case. A setting out of all the testimony would make too extended a record and would be of little use to the litigants or the profession. We will, therefore, devote our attention to those portions of the testimony which are controlling in the determination of these two questions.

While it is true that the due execution of this will was originally raised by objection, that question was taken from the jury, leaving the case in a situation where the burden of proof was upon the contestants to sustain their objection to the probate of the will.

Ida Case, the widow of Francis Marion Case, testified that Francis Marion Case died October 15, 1930; that she was a frequent visitor at the home of the Ramsdells; that Mrs. Ramsdell, on or

about August, 1924, was shopping at the Brice Store and, in moving about the place, tripped over a valve which stuck up from the floor where they turned on the heat and fractured her hip. She was taken to her home and confined to her bed for six or eight weeks. At one time the witness took Mrs. Ramsdell to the bathroom and Mrs. Ramsdell started to get up by herself and fell. Mrs. Ramsdell suffered a paralytic stroke (date not given) and fell and cut her head on a pail, and the witness noticed a change in her after that time; she could hardly speak for three or four weeks and never regained her speech as she had it before, and this difficulty continued as long as she lived; that there were times when she was better, and again they could scarcely understand her. There was a change in her physical condition after that fall. She lost herself almost entirely; her face was drawn to one side, and one of her eyes drooped ever after that and never got over it. She was weaker and went down from the beginning. This fall in the bathroom was in September, 1927 or 1928.

Dr. Carpentier testified that he was the attending physician at the time Mrs. Ramsdell fractured her hip in July, 1924, and he attended her professionally until November, 1924. He says physically she was frail, 74 years of age, and the injury from which she suffered is serious in old people. He did not see her professionally after November, 1924. During the time he treated her she was nervous, and when asked if her injury affected her mental condition he answered, "It would make her nervous and irritable. This condition would probably continue and not improve." The last time he saw her she was walking around on a crutch and a cane. She settled the bill with him and paid him.

Dr. Snitkay testified:

"I first saw Mrs. Ramsdell on the 18th day of April, 1926; had been the family physician for some years back before the war. He examined her at her home. She had a fractured hip, a great deal of pain and inconvenience. The fractured hip occurred in July, 1924. She had not regained her strength or vitality. She had been sleepless and had taken drugs for sleeping; had lost considerable weight and her general health was not good; she had dizzy spells since that time or before that. She had high blood pressure. There was nothing wrong with her urine or her blood count. The fractured hip caused her considerable pain. She complained of sleeplessness

and more or less weakness. The high blood pressure continued for some time. This high a blood pressure would mean that it had been there for months previous. A blood pressure of that degree would cause and be caused by arterio sclerosis, or hardening of the arteries. A person with such high blood pressure as Mrs. Ramsdell had naturally would have a lower mentality due to the fact that the finer cells of the brain would not be nourished properly by the blood, and if that is carried on for some time there will be a destruction of the finer brain cells. After the 27th of April, 1926, I saw her on several occasions. She complained of various and numerous things all of the time and she had reason to complain. I examined her and took her blood pressure and she was under observation and more or less treatment until a few days before her death. A year or so before she died her blood pressure went away down. In fact, the power of the heart that had been forcing that extra blood through the arterial system so many years weakened, and the muscles of the heart gave way and she had a lower blood pressure then.. That is the natural result of the high blood pressure and that is probably more or less the immediate cause of her death. After 1926 I gave her luminal generally. That is a nerve sedative, something to quiet the nerves down. It isn't dope. It is one of the standard things we have for old people. At one time she had quite a fever, bronchitis, but mostly it would be just little ailments that she would give up to. She stayed in bed for short times. She told me that she had fallen on several occasions. I only recall one time that I observed any bruises or indications of a fall. During the time I treated Mrs. Ramsdell she suffered one paralytic stroke. I do not know positively when that was. This paralytic stroke I refer to left her with a permanent contraction or paralyzing of the muscles of the throat. She was unable to eat well or to talk well after that. It affected her ability to speak, or she would be slow, unable to speak. She would try to speak sometimes and answer very intelligently after a moment or two of thinking. She did not seem able to grasp a question and answer off-hand. She would think a moment or two and answer. There would be some difficulty in the act of speaking on account of the paralyzed muscles of her throat. When I first saw Mrs. Ramsdell anyone would get the impression she had a very few months to live; she was under weight, quite a tall woman, what we would call a 'skinny' woman, and there was a look of suffering on her face which was continuously there. I

noticed a change in her physically during the time I have described. The greatest change was going downward, and after the stroke she never rallied so much after that. I should judge from my history that the stroke occurred in the early part of 1927—I might be wrong, but that is my opinion. My diagnosis of her condition after the examination in April, 1926, was a fractured hip and general breakdown mentally. If I should call that a medical term I would call it senile dementia. My first diagnosis was absolutely correct. Her condition subsequently proved it all the way through. In the human brain there are certain finer judgment cells that give us reasoning to distinguish, judgment, power to distinguish between right and wrong; the powers we have gathered through possibly billions of years of development of the human brain. When a certain time comes in our lives when the brain doesn't get enough blood supply; that the arteries feeding the brain are so hardened and shrunken up that they do not bring enough blood to the brain, the brain doesn't get enough blood—certain parts of the brain don't get enough nourishment because of the lack of that and certain cells break down, and the cells that break down first are those cells we have been billions of years accumulating. Because they are the last developed and the youngest, they naturally are the first ones to break. When they break down then our powers of reasoning, and powers of decision, and powers of judgment and power to distinguish between right and wrong are gone. When those cells are destroyed our reasoning power is gone. Senile dementia is always a progressive disease. Of these cells referred to we may destroy hundreds and more and not feel it, but if we destroy thousands we feel it; after that it is a gradual breakdown of the cells. It is always continuing. It may be quiescent for a while, but it is always breaking down. Once the disease manifests itself it is always progressive until death. Mrs. Ramsdell's condition was progressive. When the muscular coat of the arteries becomes hard, not allowing expansion or contraction, it will expand with a jump and contract quickly, and sooner or later a blood vessel breaks which it did in her case, causing this paralysis. It may be large or small—in her case it was small and in the throat. Later on the clot was absorbed and she got her speaking powers back. In cases of senile dementia the mind will continue to function as to the ordinary and necessary wants of life as eating, drinking and attending to the calls of nature. That is habit. A person might be very well and very comfortable

and have all reasoning powers and live to a very marked old age and have very little curtailment in judgment and reasoning and such as that, but that is an exceptional individual. There would be no reason why a person with senile dementia could not write checks, but in that progressive state of senile dementia they could do a lot of things because they are ordinary habits and customs. A person afflicted with senile dementia is easily susceptible to influence. That is, one of the main things in senile dementia because those powers of reasoning and those powers of judgment are shot. They would be easily led to do this and that and the other, because they haven't power to distinguish whether it is right or wrong to do that."

When asked as to whether or not Mrs. Ramsdell was suffering from senile dementia on the 19th day of August, 1927, the witness said:

"I didn't see Mrs. Ramsdell on August 19th. The last time I saw her was August 3d. At the very beginning of senile dementia where there would be only a very few of those finer cells destroyed it would not be noticeable, not only to the layman, but to the medical man, but when certain symptoms, such as forgetfulness and slowness in answering questions and the ability to be easily led or controlled or urged to do something, when they get to that stage the ordinary person could see it. In later stages persons afflicted with senile dementia develop delusions, but not necessarily in the first stages. When enough of these cells are destroyed, then delusions and illusions would be common. We speak of old people being 'childish,' having their second childhood. They do the ordinary things of life and then when some little thing happens they get upset about it. I testified several times this morning that this woman did not have a sound mind on April 27, 1926, and the disease was progressive, therefore, how could she have a sound mind on this date the next year (August, 1927)? The condition of her mind was a little bit worse than in April, 1926. When I first saw Mrs. Ramsdell, the first time, she could have been easily influenced and she would have been more easily influenced the next year than the first year, I mean in the year 1926."

The court asked the witness this question:

"Would a person afflicted with senile dementia which had been progressing to the stage which you found in the case of Mrs. Rams-

dell in the summer and early fall of 1927 be able to form an intelligent idea or conclusion and have an intelligent understanding as to the extent of property?"

The witness answered:

"I would answer that by saying that she could have personal knowledge as to the extent of the,—of her property. She might know the various properties that she owned, she might know the acreage, and be familiar with the different property and not know how to give it to anybody.. But what can she do with it, that is where reasoning comes in. It is a fact that senile dementia will sometimes be quiescent for a while. I do not believe that it would be delayed or postponed for several years; not for that long. It would depend on the mode of living of the patient, but the make-up of these people—they are never well, never comfortable, never really rational; they are always up in the air. I have no record of a slight stroke of paralysis. I think this was in 1927, am not positive about it. It might have been in 1929. It was never entirely absorbed and she had some hesitancy of speech as long as she lived. She could draw checks, could settle accounts if the people were satisfied that she settled accounts with. She could do business and in handling her business affairs if all concerned, if we all lumped it off and were satisfied. It is a fact that there are numerous cases of people who have suffered strokes and it lets up in a few weeks and they go out and handle their business affairs the same as always for years, but those people have not got senile dementia with it. They have just ordinary strokes. I think she was of unsound mind when she wrote the note on Exhibit C, because the brace was put on by a person who knew how and if she had kept it on she would have been more comfortable and the fracture was overriding and she would not be comfortable. All of these things go to senile dementia. The specific evidences of senile dementia as exhibited in Mrs. Ramsdell were these, a worried expression on her face, restless condition and constant complaining, a constant whining condition, unable to make up her mind on definite things, sleeplessness, a condition of hesitancy in answering questions and slowness in answering questions. She was nervous and had a worried look on her face all of the time, never allowed herself to be comfortable. She was not what I would call a determined woman after I saw her. The opinion that I have related was the things that

I based my opinion on that she had senile dementia. I do not know of anything else."

Mary Quinn testified that she was a frequent visitor at the Ramsdell home.

"In August, 1927, I went over and stayed all winter until the latter part of the following April. Never was there when Mrs. Ramsdell had a fall. It always happened that she had these falls when I was not there. I was called over when she had the stroke, and she could not talk plain; a change in her physical appearance. Her face was drawn and her right side paralyzed. She had several weak spells before her death. She was very sick to her stomach. From the time of her fall in 1924, Mrs. Ramsdell grew weaker down to the time of her death. I think there was a gradual change in Mrs. Ramsdell from the time of her fall in 1924. I saw at times that she could not write a check at all."

The witness was asked as to the mentality of the deceased at a time antedating the time the will was made, and she said that she noticed changes in her mentality during that time.

"I think Mrs. Ramsdell was obedient to the suggestions of my father. At the time of the death of Mrs. Ramsdell's husband, her mind was not very good. Following his death, Mrs. Ramsdell was going to make her home with her niece, Lulu Deeter, in Michigan. Her health was very poor. The attitude of Lulu Deeter towards Mrs. Ramsdell was all right; they didn't have any trouble. They started for Michigan on Saturday afternoon after the funeral of Francis Ramsdell on Thursday."

One Burns testified that some six or seven years prior he was gardening and mowing lawns and doing general work around the Ramsdell home; that after the fall at the Brice store Mrs. Ramsdell was more nervous and timid about trying to go around and she was weak. She would ask a question and in a little while ask it over again. She would make a statement about something or other and would repeat it after a little. She seemed to forget that she asked the question or made the statement.

"I noticed her face was drawn and appearance pinched, and a change in her method of talking. You could scarcely understand her at times. The weakened condition continued up to her death.

She had a wheelchair and went around in it most of the time. She would get out of the wheelchair and go around the room. I would say she was getting weaker from the time I first worked there until the time of her death. She was getting older and weaker. I was paid in cash, or sometimes Mrs. Ramsdell would fill out a check and he (Mr. Ramsdell) would sign it."

Amie Burns, a visitor at the Ramsdell home, testified that on the evening of July 4th (year not given) Mrs. Ramsdell fell from the lounge or daybed where she was lying to the floor.

"I don't know how it happened. I noticed a change in Mrs. Ramsdell's physical condition after she fractured her hip. She gradually grew weaker and was not able to get around and take care of herself. The last two or three years she was very helpless. In my judgment the most serious part of her helplessness began with this fall in her dining room. After that fall her condition seemed steadily downward. She was more what us common people call 'childish'. I can't say that I noticed a change in her mental condition after the fall in the Brice store. Don't think the fall on July 4, 1927, seriously hurt Mrs. Ramsdell, but her physical condition was bad all of the time. After that fall her speech was very bad for a while. It showed the effects of paralysis in one eye. A short time after that she.discussed matters with me at different times and always visited when I went there when she was well enough. She was not hurt when she fell off the daybed on July 4th. On July 4th she had recovered from the fall in June enough to move about or to be moved about."

Mary Quinn, recalled, testified:

"I was frequently at Ramsdell's house on Sunday in 1927. I heard Mrs. Ramsdell cry. When you would tell her she ought not to cry she would not say very much, but she generally quit. She generally asked pa (Mr. Ramsdell) about everything she did. She followed the directions given by my father. While I was there I heard Lulu Deeter directing her (the decedent) a few times, not always. There has never been the best feeling between me and Mrs. Ramsdell. There was not very apt to be good feeling when she was my step-sister."

Ethel Stotts was housekeeper for the Ramsdells beginning August 1, 1928, until January, 1931. (It will be noticed that she

commenced working there about a year after the will was drawn.) She was asked about Mrs. Ramsdell having spells of weakness, and answered that during the latter part of her term there she was much worse than the first part.

"These spells became worse. She would go on crutches across the dining room and she would reach for the door and miss the door. If she would have a fall she would have a sick spell. There was especially one she had in the spring of 1930 when she fell and was sick for some time after that. There was a great change in her physical and mental condition. Think the greatest change that I noticed was that when anything worried her she was off. Her mind was so poor, now for instance, in writing anything, if she were worried she could not collect her thoughts to do justice. There was a change in her memory during the time I was there. She enjoyed reading the daily paper, but the time came when she didn't enjoy reading it. I have seen her in a condition when she failed to realize where she was. For several weeks a year ago, I think it was in June, there were several weeks she did not know where she lived and said: 'Is this my rug and how did my things get here?' She talked to Mrs. Case and I as to whether or not she should stay here after the death of her husband, and I promised I would stay with her as long as I had physical strength to handle her. She was taken to Michigan to be cared for, Mrs. Deeter took her. I was present at a conversation between Mrs. Ramsdell and Lulu Deeter in relation to moving her to Michigan and Mrs. Ramsdell made no statement about it. Mrs. Deeter said 'it would cost too much to leave Auntie here'. On the night before they left for Michigan, Mrs. Ramsdell was brought out to supper and she didn't know whether there was anything on her plate to eat or didn't know how to eat and had a sick spell that night."

It is further made to appear from the record that the day following the execution of this will, Mrs. Ramsdell made to Lulu Deeter a deed to a quarter section of land in Dakota, and the same was recorded within a few days thereafter. The will in controversy was filed with the clerk of the court shortly after it was made, was withdrawn on an order purported to have been signed by Mrs. Ramsdell, and a few days thereafter was redeposited with the clerk and was finally turned over to one of the attorneys in this case under an order signed by Mrs. Ramsdell. It appears also that a

certain certificate of deposit and money in the bank was later turned over by Mrs. Ramsdell to Lulu Deeter.

As stated, we have not attempted to set out all of the testimony, but have reviewed it with care and attempted to outline the same in a general way. The question therefore is whether or not there was sufficient testimony to carry either the issue of mental incapacity or undue influence to the jury.

 The law governing the quantum of proof necessary on a charge of undue influence has long been settled in this state. One of the last expressions will be found in Worth v. Pierson, 208 Iowa 353, loc. cit. 359, 223 N. W. 752, 755, where we said:

"Influence, to be undue, within the meaning of the law, must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the undue influence. It must be equivalent to moral coercion, must operate at the very time the will is made, and must dominate and control the making of it."

Applying this rule to the fact situation before us, it is quite apparent that the record is wholly barren of any such quantum of evidence as is required by the rule above stated.

As to the question of mental incapacity, we are equally satisfied that the contestants have not made a case for the jury. One of the last expressions laying down the rule governing this question will be found in Cookman v. Bateman, 210 Iowa 503, loc. cit. 504, 231 N. W. 301, 302, where it is said:

"It is well settled in this state that physical weakness or infirmity, if proven, is not in itself sufficient to avoid the probate of a will, and mere mental weakness, not due to mental disease, until it has reached that stage which deprives the testator of capacity for intelligent action, does not constitute mental unsoundness such as to incapacitate him from making a will."

In the case of Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55, 57, we laid down the rule governing this question where we said:

"His mind may have become debilitated by age or disease, the memory enfeebled, the understanding weak, he may even want the capacity to transact many of the ordinary business affairs of life; but if he has mind enough to understand the nature of the instru-

ment he is executing, to recollect the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them, he has testamentary capacity."

The evidence in this case shows that the draft of the will was drawn by Lulu Deeter. She was not present at the time it was executed. The decedent called in a girl who was working for her and a neighbor, told them this was her will, and asked them to sign as witnesses thereto. No one questions but that the will makes disposition of all of her property, and there is no claim that the will omitted any one therefrom who would be expected to share in her estate. The will named various near relatives, omitting none, and specified the amount she wished each to have. The only com-plaint seems to come from the children of one of her sisters—who are the only contestants herein—who seem to think the amount given to them under the will is not enough. She had no children of her own and she made distribution between her brother and sister and the children of a deceased sister, which constituted all of her near relatives, so far as the record shows. Under the claim of the con-testants, her estate, at the time of the making of the will, consisted of about $13,000 of personal property and a quarter section of land in Dakota, the value of which is not shown in the record. Her be-quests amounted to over $6,000, or one half of her estate. As to the other half, Lulu Deeter, a niece, was made residuary legatee. The fact that on account of the death of the husband before Mrs. Ramsdell she inherited property from him after the execution of the will has no bearing on the issue. As we have reviewed this record with care, we can reach but one conclusion, and that is the contestants have not made out a proper showing on the question of mental incapacity.

Reversed.

STEVENS, C. J., and EVANS, FAVILLE, DE GRAFF, KINDIG, and BLISS, JJ., concur.