IN RE ESTATE OF NAN B. SINIFT.

BERTHA L. SNUGGS et al., Appellants, v. NORMAN F. BAKER et al., Appellees.

No. 46183.

JULY 27, 1943.

W. W. Bulman, Virgil E. Meyer, and Leo A. Hoegh, all of Chariton, for appellants.

A. V. Hass, of Chariton, and O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, all of Osceola, for appellees.

MILLER, J.— Nan B. Sinift died November 25, 1941, a childless widow, about eighty-eight years of age. On April 14, 1939, she had executed a will which directed payment of debts, expenses, etc., bequeathed $500 to Silas Baxter, a half brother, and devised and bequeathed all the residue of her estate to two half brothers, B. W. Baxter and Leonard Baxter. Norman F. Baker was nominated to be executor. He promptly filed the will for probate the day following her death. Various heirs contested its probate, asserting insufficient execution, lack of testamentary capacity, and undue influence. Trial was had which resulted in a directed verdict for proponents. Contestants appeal to this court. The only error assigned here asserts that the evidence presented a jury question on the issue of testamentary capacity.

In this case, as in most cases, there are certain facts about which there was no substantial dispute in the evidence. They form a background for consideration of the facts which are in dispute. Some of the undisputed facts are the following:

The decedent was the defendant in the case of Sinift v. Sinift, 229 Iowa 56, 284 N. W. 91, 293 N. W. 841, originally decided by this court on February 7, 1939, and, after the granting of a rehearing, again decided September 24, 1940. A second petition for rehearing was overruled January 17, 1941. The will in question was executed April 14, 1939, while said case was pending in this court. The final opinion of this court in that case gives a background of the manner in which Nan Sinift and her husband John acquired substantial wealth during their married life. Part of that wealth is an inducement for this contest.

Nan Sinift had been previously married. She had no children from either marriage. Her heirs, therefore, are collateral ones. Her mother's maiden name was Christena Wells. She first married one Crawford and had one son, John Crawford. She later married Tom Curtis and had four children, Susan A. Knight, Ruth Lyeburger, Ed Curtis, and Nan Sinift. Thereafter she married Benjamin Baxter and had three sons, Leonard, Ben, and Silas Baxter, the three of whom were the legatees under Nan's will.

The three Curtis children, other than Nan, were all deceased when Nan's will was executed, each leaving no child or spouse. John Crawford was also deceased. He left surviving him a daughter, Mary Hickman, one of the contestants herein. Silas Baxter died in June 1939, leaving two children, Helen Smith and Oral Baxter, contestants herein. Several other contestants assert that they are heirs of Nan, but their exact relationships to her are a bit difficult to determine from the record before us.

Nan Sinift and her husband John had lived on a farm in Warren county until a few months before John died on March 29, 1935. After his death Nan purchased a home in Chariton and moved there in the spring of 1936. Nan and John had been very frugal and had become wealthy. Nan lived to herself in her home in Chariton. In spite of her wealth, she continued her frugal habits, which she had always known and which were responsible in large measure for that wealth.

O. M. Slaymaker of Osceola was counsel for Nan Sinift in the litigation of Sinift v. Sinift, supra. The will in question was drawn by him in his office in Osceola and was there executed. The only people present at the time of its preparation and execution were Mrs. Sinift, Mr. Slaymaker, and two stenographers who signed as witnesses to the will. When the will was prepared, only Mrs. Sinift, Mr. Slaymaker and his private secretary, Gretta Crosby, were in the room. The three of them were there while the will was dictated by Mr. Slaymaker. As it was typed, an original and one copy were prepared. After it was typed, Mr. Slaymaker took one copy and Mrs. Sinift the other. Mr. Slaymaker read his copy aloud to her while she was reading her copy.

Mrs. Sinift said it was the way she wanted it. The other stenographer, Florence Thornton, was then called into the room and the will was executed.

As above indicated, the foregoing facts form a background for consideration of the testimony on the issue of testamentary capacity. The testimony on that issue is solely that of the contestants. Proponents introduced evidence of the due and legal execution of the will, above reviewed. Contestants then introduced evidence on the issue of testamentary capacity. At the conclusion of contestants' evidence, proponents made a motion for directed verdict. Contestants concede here that the only debatable issue was that of testamentary capacity. One of the grounds for proponents' motion was that "if the Court were to submit this case to the jury under the record as it now stands, and if the jury were to return a verdict in favor of the contestants and against these proponents, it would be the duty of the Court to set the same aside as being contrary to the record evidence and contrary to law, and that being true, it would be the duty of the Court in the first instance to direct the jury to return a verdict against the contestants and in favor of the proponents."

After very careful consideration of the record, as evidenced by a well-considered opinion, the court reached the following conclusion:

"As I listened to this record, I am compelled to but one conclusion, and that is that the Court could not let that verdict stand were the jury to bring in a verdict on the evidence thus far adduced to the effect that this testatrix was of unsound mind to the extent that she did not have capacity to make the will at that time."

The correctness of the foregoing decision presents the only question for our decision herein.

The first witness for contestants testified that he went to school with decedent in 1861 and 1862; she was seven months older than he, her birthday was September 15, 1853. The next witness testified that, in the fall of 1938 or 1939, he sold decedent a slab as a grave marker for her burial lot and placed

the same thereon and at her direction inscribed her birth as occurring in 1860.

Norman Baker, the executor, testified that he operates a bank at Lucas, Iowa, and was decedent's banker; on April 14, 1939, she had $1,965.73 in her checking account, $9,100 on certificate of deposit, a note and mortgage on real estate, signed by Ben Baxter, for $3,000, 520 acres of land in Warren county, the income for life and half of the fee to a house in Liberty Center that rented for about $7 per month, annuities with John Hancock Life Insurance Company paying $60 or $65 per month, the income from $40,000 of government bonds belonging to her husband's estate, and her home in Chariton for which she paid $4,000. On January 1, 1941, her checking account was $3,312 and the certificate of deposit was $10,395. Her net income was at least $100 per month. She drew checks on the bank from 1935 to the time of her death. A number of checks were identified. The body of the checks was written by someone else but they were all signed by Mrs. Sinift. On February 10, 1940, she made a settlement of her lawsuit over her husband's will which involved a payment to her of $25,000.

A neighbor that lived across the street from decedent testified that in 1938 she talked about getting an old-age pension. In the fall of 1940 she told of having a boy friend. In 1941 she would ask a question and before it was answered would ask another. In 1937 she paid a girl ten cents a night to stay with her and complained that she did not have any money to pay her with. She locked up her home every night about 7 p. m., bolting the door with a hammer. In the spring of 1939 she took a toy rake away from a little boy, saying it was hers; later she gave it back to him as a gift. In the summer of 1941 she tried to take some empty pop bottles away from some children, saying they were worth money and would buy her a loaf of bread. She did not remember the witness' name and asked what it was every time she talked to her. In 1936 she asked her to get her a boy friend. Oftentimes she would not open her front door to those who knocked, although she was at home. She had trouble getting down her front steps, seemed ready to topple; often talked to herself. In 1938 she brought over a printed receipt, said she could not read it, was holding it upside down, about

twelve inches from her eyes. The witness had heard that John and Nan Sinift had had bandits on their farm who tried to rob them.

The girl who had stayed with decedent testified she was fifteen years old at the time of trial; had stayed with decedent several times at night from 1937 to 1941; decedent did not talk much; bolted the doors with a hammer, locked them with a key, put chairs in front of them, put cushions from the davenport on the chairs, saying she was afraid mice would get into the davenport; she did not read; said she would pay a dime at night, but in the morning would not have any money and would bring a dime over later; she left her icebox open, the meat spoiled, but she cooked it anyway and ate it; she refused to pay fifteen cents a gallon to stem gooseberries because it was too much money; she kept all the windows closed.

Mary Hickman, one of the contestants, testified to friendly relationship between herself and decedent, but her testimony does not otherwise appear to bear upon the issue of testamentary capacity.

Another witness testified that the decedent talked to herself and locked herself out of the house twice in the spring of 1939. Another witness testified she worked for decedent one month at her home in Chariton, the time not being stated; she was paid $3 a week and board; decedent said she could not afford to pay more; decedent locked and bolted the doors every night, had little meat to eat, one egg apiece a day, said she could not afford more, talked to herself a lot. The witness found a sugar bag full of money under decedent's feather bed.

The court reporter for Judge Dougherty, who presided over the trial of the case of Sinift v. Sinift, supra, read portions of the cross-examination of Mrs. Sinift at that trial, from which it appeared that Mrs. Sinift was uncertain concerning certain items of her personal property and relied upon her banker, Mr. Baker, in the handling of the same.

A son of one of the contestants testified that between 1936 and 1939 decedent visited in their home; he took her home a number of times; she mumbled to herself: one day she wanted to stop at a bank in Chariton to see Mr. Baker, but the bank

was closed; another time she wanted to be let out at Mr. Anderson's home, thought she lived there; it was a brick house, her house was a frame building. After April 14, 1939, she told him she was going to leave her furniture to his sister because she did not want Ben Baxter's children to bother it. About February 1939, decedent got confused in the back room of a store where the witness worked; she thought she was home, began to cry, said once in a while she forgot where she was. He worked in a meat market; decedent bought very little meat, said it was too high; he sold her meat for half price because she thought it was so high; she did not wear glasses but was very nearsighted, held objects about a foot from her eyes.

A practical nurse took care of decedent for four weeks in July and August in 1940; decedent said she had made a will and had taken care of a favorite niece; said an instructor in the high school and a Mrs. Boylan both owed her money but would not pay; she kept her doors locked and bolted and the windows nailed down; she was supposed to pay the witness $12.50 per week but paid her only $40, saying she did not have any more money. Dr. Jarvis was in attendance.

Another witness testified that in 1938, during a conversation the decedent was asked what relation she was to Mrs. Bennett and to Mrs. Hickman; decedent said that they were about the same relation to her. Mrs. Hickman later testified that Mrs. Bennett was a first cousin whereas Mrs. Hickman was a half niece.

Another witness did some sewing for decedent about 1940 or 1941; decedent reported she had lost her purse, that she had been at the bank; the witness called the bank; they said she had left her purse there, so the witness went to the bank and brought the purse to her; decedent was carrying a large bag, she emptied the contents, she had some money in the bag.

A great-niece of decedent testified that in the spring of 1939, decedent came over alone, on foot, to borrow a crochet hook, worth ten cents; said she would return it, but did not; she stayed for dinner; talked as if she was hard up, wanted to borrow a crochet hook because she did not have money that day to buy one; talked about an old-age pension. In 1938 she saw decedent on the street in Chariton with tears in her eyes; asked

her what was the matter; she said she was lost, wanted to go to Blanchard's store; she was about a block from there; took her over to it. On several occasions between 1936 and April 14, 1939, decedent was sick. During that time it was hard to make her understand who the witness was; decedent kept asking her who she was; in 1939 she told decedent she was her niece; decedent said she was not, that she was John's niece, a Sinift and not a Baxter; she tried to explain to her that she was no relation of John Sinift; decedent mumbled to herself on several occasions; the doors were usually locked; sometimes her conversation would be quite broken; she would jump from one subject to another; she was nearsighted, held objects close to her eyes; she had many dresses on a rack, fifteen or twenty, some of very good material, some not; she wore only a few of them.

Another witness testified that when John and Nan Sinift lived on their farm they always had plenty of everything to eat; food was well cooked and well seasoned; Mrs. Sinift dressed like an ordinary farm woman, reasonably neat.

An instructor in the high school testified that he rented a room of decedent in 1937 and 1938; when he left he did not owe decedent any rent. Another roomer of decedent's testified that he never heard her mention that she had a half brother, John Crawford; she did not like her husband's family, the Sinifts, because they sued her; she talked to herself quite frequently; went to bed about 8 p. m. usually, locked and barred the doors, put the backs of chairs under the doorknobs, with another chair in front of the first one and cushions from the davenport on the chairs, kept the windows locked; the rooms accumulated foul air, particularly the bathroom; she did not read much, was nearsighted; he heard a businessman talking to her about making a settlement; he read documents to her, did not hear her say anything; that was about 1939 or 1940; when he left for Minnesota, he asked her to mail a suit of clothes to him, they did not come; he received a letter saying she was afraid to send the suit for fear it would get lost in the mail; between the summer of 1939 and the fall of 1941 she said she was in need; heard her mention Ben Baxter, Leonard Baxter, and Silas Baxter.

An insurance agent testified that in 1936 or 1937 he called

on decedent; she had an annuity and had not been cashing the checks; she had a letter from the company indicating she should cash the checks so they could straighten out their books.

The county auditor identified decedent's assessment rolls for 1939, 1940, and 1941, stating that she had no moneys or credits. A witness testified that he did some work for decedent in 1936; that time she paid him; he did some work in June 1941; she did not pay him; he asked her for it; she said she thought she would have it in a few days; she did not pay him, gave him the impression she did not have the money. Another witness, a carpenter, testified that along in 1939 she asked him to do some work for her; he did not say he would; she said, "Of course, I can't pay you." Another witness testified that, when Nan and John lived on a farm, she did a great deal of work. was truthful and honest in every way.

Dr. F. C. Doolittle, the operator of "The Retreat" in Des Moines, testified as a specialist in mental ailments. A long and involved hypothetical question was propounded to him; it comprises approximately ten pages of the printed abstract. Objection was made to the question. Objection thereto was sustained. The question was then modified by withdrawing certain parts of it. The objection was then overruled. The doctor then stated that, in his opinion, the person described in the question was of unsound mind on April 14, 1939, suffering from senile dementia. On cross-examination, the doctor testified that he had never treated decedent in her lifetime, his opinion was based solely on the hypothetical question.

The foregoing is a general review of the evidence upon which contestants rely. Obviously, we cannot set out all of the evidence in detail. It will be noted that many of the occurrences are remote in point of time from the date of the will, many of them having occurred months after its execution, few of them being definitely identified within close proximity of that date. In the hypothetical question propounded to Dr. Doolittle the time element is, to a large extent, ignored. This is also true of much of the argument of counsel for contestants.

This court is definitely committed to the rule that more than a scintilla of evidence is necessary to make a jury question. In applying the rule, we have held repeatedly that, where the

evidence is such that, should the jury return a verdict for the plaintiff it would be the duty of the court to set the same aside, defendant's motion for a directed verdict should be sustained. Potter v. Robinson, 233 Iowa 479, 9 N. W. 2d 457, 458, 459, and cases cited therein. The rule has been applied repeatedly to will contests. A specific example is In re Estate of Fitzgerald, 219 Iowa 988, 996, 259 N. W. 455, 459, wherein we state:

"The question at this point for determination is whether or not the court erred in thus directing a verdict. The best test we know of for determining such a question is whether or not, had the case gone to the jury and it had found adversely to what it did in this case, the presiding judge would feel that, under all the record in the case, he would be warranted in setting aside such verdict."

The foregoing rule was applied herein by the trial court. We find no error in such decision. In so doing, the court followed a long line of pronouncements of this court to which we adhere.

In the case of Perkins v. Perkins, 116 Iowa 253, 257, 90 N. W. 55, 56, this court, per Justice Weaver, states:

"While, as every lawyer knows, a man may be capable of making a good will after he is so far gone into imbecility and mental darkness as to be no longer capable of making a valid deed or of transacting business generally, the very opposite conclusion seems to pervade the lay mind, and the making of a will is, to its apprehension, the one item of business which requires the presence of all one's faculties in their normal strength."

The foregoing statement applies to the situation herein. Mrs. Sinift, however, had not become incapacitated from handling her business affairs. She looked out for herself to the very end. A year after the will was made she settled a lawsuit over her husband's will involving a payment to her of $25,000. She maintained a bank account subject to her checks of several thousand dollars. There is no evidence of inability to transact business generally. Such evidence as appears in the record supports her ability to do so.

She was in advanced years, subject to the infirmities of her years, and with many eccentricities not uncommon to ad-

vanced age. This did not render her incompetent to make a will. In Perkins v. Perkins, supra, at pages 259, 260 of 116 Iowa, page 57 of 90 N. W., Judge Weaver states for this court as follows:

"The right of a man to dispose of his property by will as he sees fit is one which the law is slow to deny. No mere weakening of his mental powers—no mere impairment of the faculties —will invalidate a will executed in due form, so long as he retains mind enough to know and comprehend in a general way the natural objects of his bounty, the nature and extent of his estate, and the distribution he wishes to make of it. It is not necessary that he should be competent to make contracts, or to transact business generally. [Citing cases.] * * * His mind may have become debilitated by age or disease, the memory enfeebled, the understanding weak, he may even want the capacity to transact many of the ordinary business affairs of life; but if he has mind enough to understand the nature of the instrument he is executing, to recollect the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them, he has testamentary capacity." (Citing cases.)

Another statement of Judge Weaver's in the case of Leonard v. Shane, 182 Iowa 1134, 1141, 1142, 166 N. W. 373, 375, is quite apt as applying to the testimony of Dr. Doolittle and much of the evidence upon which he relied, to wit:

"So much has this been the case that courts and juries are not infrequently asked to find that a person who, up to the last of his life, was in full charge and control of his own affairs, transacting business and caring for his own interests with a reasonable degree of intelligence, was, nevertheless, incompetent to execute a valid deed or make a valid gift or will, because he was a 'senile dement.' In proof of such claim, it is never difficult to find witnesses who remember that he was forgetful, or was absent-minded or childish; that he would repeat old stories; had become careless in matters of dress; that he sometimes failed to recognize a friend or acquaintance; that his eyesight and hearing had become impaired; and so on through the whole category of infirmities which usually and normally appear in those who have

passed the zenith of life and wend their halting way to its sunset. Nor is there ever wanting the expert, ready to respond to a hypothetical question embodying all these details, that one who manifests these varied symptoms is a 'senile dement.' Such answer may be scientifically correct, in the way in which the expert uses the phrase; but it is no less true, as a matter of law and of common observation and common sense, that the existence of these normal and usual accompaniments of age do not imply any lack of capacity to deal with one's own, or to make an intelligent disposition of property by grant, gift, or devise. It may be true that the very entrance upon old age marks the beginning of loss or decay of mental power, and that from such moment such person suffers some degree of senile dementia; but the business, social, and political world is full of proof that the power to think intelligently, reason clearly, and perform intelligently, the ordinary functions of business life, may long survive the passing of youth and middle age. The law also recognizes the fact that the right of the old to control and dispose of their own property, and their right to the uncontrolled choice or selection of the persons to whom they will extend their bounty, are of peculiar value, and will be respected by the courts. It is elementary that capacity to exercise such right is not inconsistent with a very considerable degree of mental weakness, and it survives the capacity to buy and sell property and do business generally, so long as there remains the capacity to understand the nature and extent of one's estate and the effect thereon of his act, and the claims, if any, which others may have on one's remembrance in its distribution. Sevening v. Smith, 153 Iowa 639; Gates v. Cole, 137 Iowa 613; 618; Hanrahan v. O'Toole, 139 Iowa 229; Nowlen v. Nowlen, 122 Iowa 541; In re Evan's Estate, 114 Iowa 240; Perkins v. Perkins, 116 Iowa 253. In short, mere senile weakness, the normal and to be expected incident to advanced age, does not imply incapacity to make a valid gift, or other disposition of property.''

Many other cases might be quoted from. Space will not permit. The more recent decisions of this court which support the decision of the trial court include the following: In re Estate of Hayer, 230 Iowa 880, 299 N. W. 431; In re Estate of Johnson, 222 Iowa 787, 269 N. W. 792; In re Estate of Haga, 222 Iowa

1313, 271 N. W. 296; Green v. Ellsworth, 221 Iowa 1098, 267 N. W. 714; In re Estate of Fitzgerald, supra, 219 Iowa 988, 259 N. W. 455; In re Estate of Ramsdell, 215 Iowa 1374, 244 N. W. 744; In re Will of Diver, 214 Iowa 497, 240 N. W. 622; White v. White, 213 Iowa 1244, 241 N. W. 1; Cookman v. Bateman, 210 Iowa 503, 231 N. W. 301.

After careful examination of the record herein and the many authorities cited by counsel on both sides, we reach the conclusion that the trial court was right. Accordingly, the judgment is—Affirmed.

MULRONEY, C. J., and SMITH, HALE, MANTZ, OLIVER, and GARFIELD, JJ., concur.

BLISS, J., dissents.