IN RE WILL OF JAMES B. DIVER.

ADA REED et al., Appellants, v. AMELIA B. SMITH, Appellee.

No. 41178.

FEBRUARY 9, 1932.

REHEARING DENIED MAY 4, 1932.

498

E. W. McManus, for appellants.

Burrows & Burrows and Ralph B. Smith, for appellee.

GRIMM, J.—James B. Diver died at Keokuk, Iowa, in October, 1930, at about the age of 84. The will in controversy was executed on November 27, 1929. In the will, the testator provided for the payment of his debts, gave detailed instructions in reference to a tombstone and what should be carved thereon, made eight bequests of $50.00 each, two bequests of $100.00 each, and one bequest of $200.00. He then gave Amelia B. Smith 5 shares of Northwestern Bell Telephone Company stock and 10 shares of Baltimore & Cumberland Valley Railroad Company stock. Following this, the will contains the following:

"I do hereby give and bequeath unto the following three persons, share and share alike, nine tenths of the income derived from 'the Residue,' as stated below. Frances Herriott Swanwick, Joplin, Mo.; Elizabeth Herriott Sturgeon, Baltimore, Md.; Cecelia Caswell Macfarlane, New Orleans, La. The remaining one-tenth to the Ladies Aid Society herein named. This revenue shall be derived only from Securities, such as Bonds and Stock Investments, if any such there be, and then only after closing and settlement of my Will. In the event of the passing of one or more of the three individuals named, the Income shall then be equally divided, and.paid to those remaining, until all have passed on. Each ninety days after closing of This Will. Then the entire revenue shall pass to The Ladies Aid Society herein named. All the rest, residue and remainder of my Estate, real, personal or mixed, of whatsoever nature, and wheresoever situate, which I may own or have the right to dispose of at the time of my decease; I give, devise and bequeath unto, The Trinity Methodist Episcopal Church of Keokuk, Iowa, In Trust, for the following uses and purposes: The said Trust is to be known as, The Lorene Curtis Diver Memorial, to be applied strictly in accordance with the Directions and Instructions attached to This

Will and made a part hereof. It is my désire and intention that this Trust is, and shall be perpetual, for Educational, Religious, and Charitable Purposes.''

There follows the appointment of Amelia B. Smith as executrix and trustee. She is relieved from filing inventory or giving security. $150.00 per month is provided as compensation as executrix and trustee, which is to be in lieu of all other compensation. The will provides that if she should die prior to the administration of the estate, the Judge of the District Court shall appoint a successor. There is a provision for referring any differences which may arise in reference to the will or the trust to the Judge of the District Court of Lee County. There follows this request:

''I request, that my esteemed friends, Hon. James S. Burrows, and Leroy J. Wolf, aid and assist my Executrix in discharge of her duties, should request their aid and advice.''

Burrows is an attorney in Keokuk.

The document is properly witnessed and certified. At the same time, a document consisting of twelve pages was signed. His signature was witnessed by the same parties who witnessed the signature on the will. These twelve pages contained minute details in reference to ''Port Sunshine,'' which is the name given to the home which is to be the center of the Lorene Curtis Diver Memorial.

The testator left neither spouse nor issue surviving him. His wife, Lorene Curtis Diver, died in the year 1922. The Lorene Curtis Diver Memorial is one provided to her memory. The testator and his wife had traveled much abroad. They had gathered up some valuable and rare curios and antiques, of which apparently both were very fond. These were in ''Port Sunshine,'' the home.

The testator had been a prominent business man in Keokuk. He was by profession an engineer and contractor. He had been a self-reliant and rather dominating character. He had accumulated a fortune of approximately $75,000.00 in value. This consisted of real estate and various securities. When he was about 74 years of age, his wife died. Some time thereafter, he employed the proponent, Amelia B. Smith, a middle-aged lady, as

his housekeeper and she continued to manage his household until his death. In January, 1929, he suffered a broken right arm in an accident. About that time, the proponent began writing checks for the testator. Arrangements were made between the testator and his bank whereby checks of this kind were honored and it appears that a very large percentage, if not all, of his checks after the date of his accident, were signed by the proponent.

The testator's relatives are all distant and for the most part lived away from Keokuk and were seldom seen by the testator. Frances Herriott Swanwick, one of the beneficiaries who lives at Joplin, Missouri, is a first cousin to the testator. Cecelia Caswell Macfarlane, of New Orleans, La., was a cousin. Elizabeth Herriott Sturgeon, of Baltimore, Md., was a cousin.

The will was filed on November 6, 1930. On November 19, 1930, the contestants filed their objections and contest, alleging four grounds:

1. That the said instrument is not executed in legal form.

2. That said instrument is so vague, indefinite, and contradictory as to make its meaning unintelligible and impossible of construction or interpretation.

3. That the provisions set out in said purported instrument and the instructions annexed thereto wherein an attempt is made to create trusts are so indefinite and vague both in the nomination of trustees and in the designation of objects as to make the same impossible of administration and render the same void and of no effect in law.

4. That said instrument is not the last will and testament of the said James B. Diver, deceased, in that the same was procured by and is the result of undue influence, fraud and duress.

On February 23, 1931, in response to a ruling on a motion for more specific statement, an amendment to the objections and contest was filed, in which it is alleged that the testator at the time of the execution of the instrument was "past 80 years of age and suffering from illness and senility," after which there was a recital in reference to the presence of Amelia B. Smith, the proponent, in the home and an allegation that she dominated his actions and by undue influence, secured the execution of the will.

On April 27, 1931, the cause went to hearing, and on April

29, 1931, an amendment to the objections and contest was filed, in which it is alleged that the testator was of *unsound* mind at the time the instrument was signed.

Some of the contestants are related to the testator, as follows: Ada Reed, Alice Brice Woodward Hill, Adeline W. Hall and Frances Herriott Swanwick are cousins of the testator. Some of them are beneficiaries under the will.

At the close of all the evidence, the court directed the jury to return a verdict for the proponent.

Some 26 errors are alleged and relied upon for reversal. Manifestly, it will be impossible to treat these separately, but they will be considered in groups.

I.  Seven of the errors relied upon for reversal may be grouped as relating to the exclusion of testimony of lay witnesses and the striking of certain answers made by them. In four or more of these instances, the answers were stricken because the answers were manifestly mere conclusions or opinions of the witnesses, or the evidence was clearly incompetent or immaterial. In each instance where the objections to the introduction of the testimony was sustained, either the answers were mere expressions of conclusion or opinion or the questions called for wholly immaterial testimony. Moreover, in some instances, the questions called for mere repetition on the part of the witness.

A very careful examination of the record in regard to these alleged errors abundantly satisfies us that no error was committed. It would serve no good purpose and would unduly extend this opinion to set out in detail the questions and answers and a discussion in reference to our holding on each point.

II.  Six of the errors relied upon for reversal deal with testimony offered concerning the use of intoxicants by the testator. There is no showing in the record that the testator was suffering from any disease. It appears that his infirmities, if any he had, were those which usually follow old age.

It is nowhere contended by the appellant that the testator was a drunkard or habitually used intoxicants.

In some of the questions to which objections were sustained, inquiries were made as to whether he had at any time been under the influence of intoxicating liquors before June, 1929, the will having been made in November of the same year. Other

questions sought to show that at a time not very definitely fixed, the testator and Amelia B. Smith attended a social dancing party where some intoxicants were used. Other questions pertaining to the use of intoxicants were sustained because the question was faulty in form. Other questions merely sought to ascertain whether the witnesses at one time or another had smelled intoxicants on the testator's breath. In some instances, after objections were sustained to questions which were improperly formed, answers were procured to properly formed questions.

There is no merit in appellant's complaint in regard to this line of testimony.

All of these objections have been carefully examined. We find no reversible error in connection therewith.

III. Some of the errors relied upon for reversal have to do with testimony pertaining to the amount of money paid by the testator to the proponent, Amelia B. Smith, and certain investments made by her during the time she was keeping house for the testator.

Manifestly, the investments of the proponent, under the record in this case, are entirely immaterial to the issue before the court and jury.

Some of the questions sought to elicit statements alleged to have been made by the testator relative to money he had paid to the proponent prior to the making of the will, but at a time not indicated.

Upon this particular record, we find no reversible error, as alleged.

IV. Some of the errors relied upon for reversal have to do with testimony offered by the contestants to the effect that the testator had at various times made statements as to what he proposed to do in the way of making legacies and "remembering" certain parties in his will. This line of testimony is offered in the main on the question of undue influence. This court said in Muir v. Miller, 72 Iowa 585, l. c. 590:

"But it is nowhere held that prior declaration of an intention contrary to the subsequent disposition may be shown to establish undue influence."

Manifestly, any person of sound mind and disposing mem-

ory, may, while contemplating final disposition of his property, change his mind as to what he ultimately concludes to do with it.

The subject of undue influence will be noted later in this opinion, but at this point, we rule that no error was committed, as claimed by the appellant, in connection with the exclusion of testimony on this subject.

V. Six errors relied upon for reversal are based upon refusal of the trial court to permit non-expert witnesses to express an opinion as to the unsoundness of mind of the testator. The record has been very carefully examined and it discloses that for the most part, the circumstances to which these non-experts referred in their preliminary testimony are of a trivial character. For illustration, one witness related a telephone conversation he had with the testator in the early part of 1930. It is as follows:

"After I called the telephone number, Mr. Diver himself answered. I asked him how he was feeling and he said: 'Brother Williams, I am in a hell of a mess over here.' I said: 'What is the matter?' And he said: 'Well, where the damn faucet had leaked or the pipe broke and run all over, flooded the closet, and I have got a plumber up here. I am trying to get the mess cleaned up before Mrs. Smith comes home, or she will raise the devil.' "

Another witness testified in reference to a conversation he had with the testator "within a year or two from the date of his death." The witness referred to the testator as:

"Well, he was an aged man, of course, disintegration was proceeding bodily and mentally also, to a certain extent,—what you would expect in a man over eighty years of age?"

He also stated that the testator repeated incidents, not in one conversation, but in different conversations. Another witness who had known the testator for a number of years and who called at the testator's home frequently on friendly visits referred to him as a very positive man. The witness testified that in the latter years of his acquaintance with him, he was prone to refer to past events and reminisce more or less.

None of these witnesses detailed sufficient facts to allow a

non-expert witness to express an opinion in reference to mental unsoundness. These questions have been so often before this court that it is unnecessary to review former decisions. We quote, however, from one of our very recent cases filed in February, 1931, entitled Campfield v. Rutt, 211 Iowa 1077. In that case, this court said:

"A nonexpert witness was told to base his opinion upon the things which he had testified to, and then to state whether or not, in the latter part of July, 1927, Mr. Smith (the testator) was of sound or unsound mind. To this the defendants objected, 'as calling for an opinion and conclusion of the witness, the witness not detailing sufficient facts to allow a nonexpert witness to express an opinion.' This objection was sustained and an exception taken. We find no error at this point, as the facts testified to by the witness were not sufficient to indicate unsoundness of mind. What is necessary to be shown in order to lay the foundation for nonexpert opinion as to unsoundness of mind has been so frequently discussed by this court that it seems unnecessary to review our former decisions. The rule is that there must be something seen or observed and related by the witness which shows an abnormal state of mind. The duty devolves upon the court to determine whether such facts have been disclosed by the testimony of the witness as to entitle the witness to express an opinion as to unsoundness of mind. As to what facts would be a sufficient foundation to warrant the giving of an opinion as to unsoundness of mind by a nonexpert witness must depend upon the circumstances of each case, and must be left for the trial court to determine in the exercise of a sound legal discretion; and the ruling of the court in this respect should not be disturbed, unless it clearly appears that it has not properly exercised the discretion with which it is vested. See Denning v. Butcher, 91 Iowa 425; In re Estate of Workman, 174 Iowa 222."

There is no error in the appellant's contentions at this point.

VI. It is contended that the issue of undue influence should not have been withdrawn from the jury. A large part of the record in this case is devoted to that issue. It would serve no good purpose to quote extensively from the evidence. One of the principal contentions of the appellant is that, because the

proponent, Amelia B. Smith, for a considerable period of time prior to the testator's death, signed the testator's name to checks on his bank account, this is strong evidence of undue influence exercised over him.

The proponent was his housekeeper and, in a sense, so far as he needed one, his nurse. He had no relatives in the city in which he lived. There was no one close to him. He had retired from business about the time of the death of his wife in 1922. He had no office. There is nothing important in the matter of the signing of those checks. This is particularly true when it is recalled that in 1929 he broke his right arm so that it became practically impossible for him to sign checks. Moreover, it is a matter of common knowledge that even in large, successful business houses, the authority to sign checks is often delegated to subordinates in the office organization. Under varying circumstances, such authority is conferred upon others.

It is claimed by appellants that at various times the testator made statements concerning his intentions to dispose of his property other than as he did. We are asked to infer from these circumstances that proponent unduly influenced him to change his mind.

The testator had a perfect right to change his mind as to the disposition he would make of his property. There is no evidence in the record even tending to prove that the proponent Smith did anything or said anything which could be understood as attempting to influence the testator.

It is significant that the proponent receives only minor bequests and only receives additionally a compensation for services to be rendered as trustee under the will.

The record clearly shows that, from a time shortly after the death of the testator's wife, he began thinking about and talking about the matter of a memorial to her. The record shows he talked with various members of the various church organizations about it. Undoubtedly, he discussed the matter fully, in its details, with the proponent.

As previously noted, the home contained curios and antiques which had been gathered in his travels in foreign lands.

The testator was more or less opinionated even to the point of perhaps being egotistical. Apparently these peculiarities became slightly stronger with the years. He desired to definitely

control his property as far as possible, even after his death. Manifestly, he believed that the proponent would carry out his wishes. She knew more about them than anyone and it is entirely reasonable that, in his efforts to prolong his control over his property as long as possible, he should select the one who knew the most about his home, his personal belongings and keepsakes, and the one who, he undoubtedly found, was willing to comply meticulously with his desires in regard to his property affairs, particularly the memorial.

There is no substantive evidence in the record of any undue influence by the proponent over the testator. Many insignificant circumstances are injected into the record in an effort to show that the proponent controlled the testator. This may be illustrated by the testimony of one or two witnesses to the effect that at times they were unable to see the testator when they asked for an interview with him at his home. The record does not show what his state of health may have been at those times. The record does show that some stock solicitors were, at various times, endeavoring to sell securities to him. Perhaps he had a perfectly good reason for not wishing to see them at the particular time when the interview was sought. Many keen, successful business men use employees as "buffers" to ward off solicitors and other unwelcome visitors.

The rules pertaining to undue influence have been often expressed by this court. We deem it unnecessary to review the cases or repeat what we have said. A very few quotations will be sufficient. In In re Estate of Paczoch, 202 Iowa 849, l. c. 854, this court said:

"We have repeatedly held that mere solicitation, request, or importunity is not sufficient, unless such influence is brought to bear as that the will of the testator is overcome by that of the person exercising the influence."

See also Wolfe v. Shroyer, 206 Iowa 1021 and cases cited; Cookman v. Bateman, 210 Iowa 503.

This court said in In re Will of Johnson, 201 Iowa 687 l. c. 690:

" 'To be "undue," the influence must have been such as to destroy the free agency of the testatrix, and make her the implement of her husband's craft, and make the instrument ex-

ecuted by her the will of her husband, rather than her own. It must operate to destroy her free agency, not at some time in the past, but at the very time and in the very act of executing the instrument. Solicitations, however importunate, cannot themselves constitute undue influence; for, though these may have a restraining effect, in that they persuade or induce the mind of the testatrix to consent to the thing asked for, they do not destroy her power to freely dispose of her estate.' Henderson v. Jackson, 138 Iowa 326. See also, In re Estate of Townsend, 128 Iowa 621; Mallow v. Walker, 115 Iowa 238; Sutherland St. Bank v. Furgason, 192 Iowa 1295. Opportunity to exercise undue influence is not sufficient to carry the case to the jury. Zinkula v. Zinkula, 171 Iowa 287. Neither are opportunity and disposition, plus persuasion and importunity, sufficient to make a jury question. In re Estate of Mott, 200 Iowa 948.''

On the whole record pertaining to the question of undue influence, it satisfactorily appears that the contestants failed to introduce sufficient evidence to warrant a verdict of the jury in favor of the contestants on this issue.

■ VII. As previously noted, at the close of all the evidence, the court directed a verdict for the proponent.

The attending physician who treated the testator from 1924 until the time of his death, testified he was of sound mind. He had treated him for neuritis in 1924, for a broken arm in January, 1929, and the pneumonia which ended in his death. This last illness lasted for a period of about ten days. In addition to these specific illnesses, it appears that whenever the testator felt badly, he called on the doctor, sometimes for the treatment of gout, rheumatic conditions and neuritis. The doctor was treating him during November, 1929, for neuritis. It will be recalled the will was executed on November 27, 1929. The doctor says he was at the testator's home 6 or 8 times that month treating him for neuritis. As the doctor says, ''He would want a doctor for the least little thing.'' The attending physician was a close friend, as well as the testator's medical adviser. He knew the testator very well. He testified that while treating the testator for neuritis, he called on him on the 26th of November, the day before the will was written.

Without extensively reciting the relationships between the testator and his attending physician, suffice it to say his op-

portunity of knowing the testator's condition at the time the will was made gives his evidence unusual probative value.

Approximately a dozen of the friends and neighbors of the testator testified he was of sound mind. Many of these people had transacted various kinds of business with him, some of it shortly before his death. From the facts and circumstances related by them, they were thoroughly familiar with the testator, his habits and his mental and physical condition.

On the other hand, a number of physicians, in answer to hypothetical questions, testified they regarded him as of unsound mind at the time the will was made. An examination of the hypothetical question discloses that it deals with such circumstances as the following: After the death of his wife, he was deeply affected thereby and much alone thereafter. He engaged the proponent as housekeeper. Thereafter some of his relatives noticed a difference in his attitude towards them. It is claimed that he seldom wrote to them and some of his letters were in typewriting instead of longhand. He dwelt on his old experiences and personal accomplishments, expressed himself with some bitterness towards some people whom he did not like. He was at times forgetful. There was a marked change in his physical appearance compared to previous years. Towards the last, he remained at home much of the time. Some of his friends were unable to see him. He removed some of his papers from his safety deposit box to his home. He permitted his housekeeper to write his checks. He refused to buy some stock from a stock salesman. At one time, he seemed to be in a panic because of a broken water pipe in his home. At one time in conversation with his attorney who was trying to induce a settlement, the testator said he was a tiger when he got into court. At one time, in relating his experiences in the Holy Land, he remarked that the people there were what he would term "niggers" and said even Christ must have come from the race of Negroes. In November, 1929, he signed an instrument for a will. No attorney was present at the time it was executed and it was typed by the housekeeper.

The foregoing is a skeleton outline of the hypothetical question upon which some experts gave the opinion that the testator was of unsound mind. In many respects, what little there is in the hypothetical question is not satisfactorily supported by the

record. Some of the expert witnesses had not seen the testator for many years, others made no claims to being specialists in mental diseases. Some of them expressed an opinion that "he could not carry on his business successfully." Others testified that "he was not normal." One doctor testified that he meant by unsound mind that the testator was "not normal."

This question of the sufficiency of evidence on the part of contestants to take the case to the jury has often been before this court. We shall make no attempt to gather or review the cases. We deem it sufficient to quote only from a few of the later ones. In In re Will of Johnson, 201 Iowa 687, this court said:

"The burden is on the contestant, in a case of this character, to show that the deceased did not have sufficient mental capacity to comprehend the nature of the instrument she was executing and to recollect the property she meant to dispose of, the objects of her bounty, and the manner in which she wished to distribute it among them. In re Will of Richardson, 199 Iowa 1320; Sevening v. Smith, 153 Iowa 639; Perkins v. Perkins, 116 Iowa 253, and cases there cited. Mere old age or some deterioration in physical or mental power, or peevishness, childishness, and eccentricity, are not sufficient to carry to the jury the issue of mental unsoundness of the testator. In re Estate of Shields, 198 Iowa 686; In re Will of Richardson, supra; In re Will of Kester, 183 Iowa 1336; In re Will of Byrne, 186 Iowa 345. It is not the duty of the court, in disposing of a motion for directed verdict, to submit the case to the jury because there is some evidence introduced by the party having the burden of proof, unless that evidence is of such character that it would warrant the jury in finding a verdict in favor of the party introducing such evidence. Before the question is left to the jury for its determination, the preliminary question for the court is whether there is any evidence to support the verdict, and if so, whether, upon such evidence, the jury can find a verdict for the party producing it that will stand. Bales v. Bales, 164 Iowa 257; Seamans v. Gallup, 195 Iowa 540. The above rule announces the quantum of proof necessary to be produced by contestants before they are entitled to have their case submitted to the jury."

In In re Estate of Paczoch, 202 Iowa 849, l. c. 853, this court said:

"The right of a citizen to dispose of the property which he has accumulated during his lifetime in such manner as he sees fit, under certain statutory limitations, is one of the greatest inducements to thrift and to the accumulation of property, and one that the courts should be slow to deprive a testator of exercising because of a claim that he is mentally incompetent to do so. It is a matter of common knowledge that with advancing years the faculties grow dim, and the mental processes are slower; but such condition, without more, does not necessarily deprive a testator of the mental capacity to execute a valid will. So long as he retains the ability to know his property and to remember the natural objects of his bounty and to exercise judgment and discretion in regard thereto, he is mentally competent to execute a valid will. In this connection, we have not overlooked the fact that the appellants offered as an expert witness a physician who had never examined the testator, but who, in answer to a hypothetical question propounded to him by the appellants, said that in his judgment such a person as the man described in the question would be a person of unsound mind and affected with senile dementia. On cross-examination, he said that a person might do one thing correctly, and might do half a dozen things correctly; that he might enter into a contract and carry it out and appreciate the nature and terms of the contract; that he might do some things right, or some group of things, and still would be in such a state of mind that the witness would call him of unsound mind. The testimony of this witness, coupled with that of the non-experts, was not sufficient to carry the contestants' case to the jury."

Many other cases might be cited.

Undoubtedly, on many occasions, expert testimony is of the greatest possible value. There are many fields of scientific investigation and knowledge in which the ordinary mind is practically lost. The hypothetical question propounded to these experts does not belong to that class. It deals almost entirely with the little eccentricities so common to advanced years. There is nothing in the hypothetical question which is beyond the range of the ordinary individual of normal information and experience. Moreover, in many particulars, it does not have proper support in the evidence.

Upon the whole case, there is not sufficient evidence on behalf of the contestants to carry the case to the jury. Any verdict which might be returned in favor of the contestants must necessarily be set aside for want of proper support in the evidence.

All the claims of the appellant have been carefully examined and we find no reversible error. It follows that the cause must be, and is,—Affirmed.

All Justices concur.