GEORGE A. WILSON, Executor, Appellee, v. RIEKA FINDLEY, Appellant.

No. 43957.

1282

SEPTEMBER 21, 1937.

Vernon W. Lynch and Tom K. Murrow, for appellee.

Hallagan, Fountain, Stewart & Cless and Earl C. Mills, for appellant.

HAMILTON, C. J.—The crucial questions in the case are: (1) Was there a completed gift to the defendant and her mother of

the property sought to be recovered by this replevin suit? (2) was the donor, Park A. Findley, mentally competent to make such gift? Appellant contends that there was not sufficient evidence tending to negative either of these propositions to warrant the court in submitting the same to the jury, and hence the trial court erred in overruling her motions for a directed verdict.

■■■ After a very thorough and careful consideration of the evidence, in the light of the prior holdings of this court, we find ourselves irresistibly drawn to the conclusion that appellant is correct in her contention, and that both of these issues should have been disposed of as a matter of law. It is not possible within the proper compass of an opinion to set out the evidence in detail, and we shall not attempt it. Both of the above questions were submitted to the jury. The burden of proving the gift was placed on the defendant, and the burden of proving incompetency was placed on the plaintiff. As to the latter, the jury by its verdict in favor of the defendant as to the money on deposit has, it seems to us, in substance and effect found that Findley was competent. The gift of this money was not consummated by actual delivery until the 27th of April, 1935, when checks for the amount in each of the two banks were made and delivered to Rieka Findley, whereas the transaction constituting the alleged gift of the other property involved in this appeal occurred on the 8th of April, 1935. It was and is the claim of plaintiff that the donor was afflicted with syphilis, and this had caused paresis,—a form of insanity—a mental affliction that impairs the structure of the brain; that this condition existed on the 8th of April, and was of long standing. Therefore, when the jury passed on this matter and found the decedent was competent to make a gift of the money at a later date, there being no evidence of any change for the better, it necessarily follows that it cannot be consistently contended that the donor was incompetent on the prior date, and if he was competent to make a gift of a portion of his property, he was competent to dispose of all. There was no appeal from the verdict in defendant's favor sustaining the gift of the money.

■■■ But we need not base our conclusion on this verdict alone. The evidence as we view it is so conclusively in support of mental competency, and there being no evidence by which the jury could be guided as to the degree of mental impairment, or evidence that such claimed impairment was such as to render the donor incompetent to make a valid gift, this issue as a matter of

law must be settled in favor of defendant. Likewise, the evidence relating to the gift of the property in dispute lacked none of the essential elements necessary to establish a completed gift inter vivos. The evidence is clear, cogent, definite and convincing and leaves no room for any doubt whatever that the donor intended to make, and did make, such a gift. There being no conflict in the evidence on this subject, there was nothing for the jury to pass upon.

■■■ As a background for the picture presented by the facts, it should be stated that there is no claim in the pleadings of fraud, either actual or constructive, no claim of the existence of a fiduciary relationship. Neither is there any proof of such, and while undue influence was alleged in the reply, there was no evidence which even tended to support such allegation, and the court properly withdrew this issue from the jury. Very briefly let us look at Findley, the man, and then see what took place, as shown by the evidence.

At the time of his death, Park A. Findley was 60 years of age. By profession he was a physician and practiced his profession in Des Moines until 1922. His first wife, Laura A. Findley, died August 10, 1933. He had no children. After his first wife's death he made his home with his aged mother and sister, Rieka, a single woman, employed for many years in the legal department of the city administration of Des Moines. He had one brother and another married sister. In 1922 he was elected sheriff of Polk County, and served until 1930. On January 1, 1933, he was appointed by the newly elected attorney general, Edward L. O'Connor, to the position of chief of the bureau of criminal investigation of the State of Iowa, which he held until his death. At the time of his death he held the rank of Brigadier General in the National Guard and commanded the 57th Cavalry Brigade. Just prior to his death he was tentatively selected by the adjutant generals of six states for promotion to the rank of Major General in command of the 24th Cavalry Division, composed of the National Guard Cavalry troops from six states. Apparently he had been in failing health for some time and about the first of April, 1935, he obtained from the attorney general's office permission to take a sixty-day leave of absence, and planned to make an extended trip through several states for the purpose of recuperating his health. His brother, John, a contractor residing in Manilla, in the Philippines, who had not seen his

brother for several years, planned to meet General Findley and accompany him at least on a part of this tour. Before starting on this long journey, Gen. Findley went to Hill's Retreat, a sanatorium for the treatment of nervous and mental diseases, located in the city of Des Moines, and managed by one Dr. R. C. Doolittle, for the purpose of taking a rest. He did not go there for treatment. He remained in this institution from one o'clock a. m. on April 6, 1935, until 7:45 a. m. on April 9, 1935. Glen L. Schmidt, one of the several state agents working under Chief Findley, who was in communication with his chief almost daily, and was to be placed in the position of acting chief in the absence of Findley, called at Hill's Retreat on the 6th or 7th of April on his usual daily visit, and at that time Mr. Findley asked Schmidt to make arrangements with Walter Maley, and his sister, Rieka Findley, to meet him there on the evening of the 8th of April. Maley was then first assistant attorney general and had charge of the criminal causes in the supreme court and other matters of this character which might come up in the attorney general's office, of which office the bureau of criminal investigation was a coordinate part. They met as per arrangements thus made. After some general conversation, which is not set out in the evidence in detail, Maley asked General Findley if there was any business that he had especially in mind, either in the department, or any business interests of his own he wanted to take care of before he left on this long trip—which would be attended with more or less hazards—and Findley said the one thing he did want to do before he left was "to give to his mother and to his sister the contents of two lock boxes that he had, one in the Iowa-Des Moines National Bank and one in the Valley Savings Bank, or national bank (the name appears both ways in the record), that he intended that Rieka and his mother should have it all some day anyway, and he would rather give it to them before he left." He asked Maley if there was any formality he would have to go through to accomplish this purpose. Maley informed him that perhaps all that was necessary was an order on the banks to turn over the contents of the lock boxes to his sister. Findley went to a small dresser in the room, got two sheets of blank paper, handed them to Maley and asked him to prepare such orders. Two separate orders were prepared as follows:

"4/8/35. I hereby authorize bearer, Rieka Findley, to open

my safety deposit box 1223 Valley Nat'l Bank and to withdraw contents therefrom. (Signed) Park A. Findley
 "Park A. Findley"

The other order is the same, except it bears a different box number and the name of the bank is the Iowa-Des Moines National Bank. These orders were identified and introduced in evidence as Exhibits A and B. The signature on the line was made by the decedent, and the name under the line was written there by Mr. Maley before handing the paper to Findley. Findley sat on the edge of the bed as he wrote his name.

These lock boxes were owned jointly by Park A. Findley and his sister, Rieka. They each had keys to these boxes. After signing these orders, Exhibits A and B, Findley took his keys, handed them to his sister Rieka with the written orders and said to her: "These are my keys and you have your own, Rieka. I wish you would go to the banks in the morning and get the contents of each of the boxes and call me from down town (Rieka worked down town). I will be at mother's, and let me know you do have the contents of both boxes before I leave town." This was all in the presence of Maley, Schmidt, and Miss Rieka Findley. The next morning she went to the banks with the written authority above referred to, presented them at the banks and the bank officials turned the contents of these two safety deposit boxes over to her. Schmidt's version of the inquiry Findley made was: "He (Findley) asked Maley just what he would have to do to release some property as a gift to his sister and mother." The remainder of Schmidt's testimony is substantially the same as Maley's. This witness also testified that in relation to all the arrangements and preparations for the trip, General Findley issued his own orders.

That Findley understood what he had done, and that he intended it as a gift is emphasized by the testimony of two or three witnesses who related conversations with Findley after the gift was consummated. Morris Hanson who drove Findley on his trip stated in substance that while they were eating dinner at Excelsior Springs the evening of the first day out, Findley said that he felt quite relieved to get away from Des Moines, from his official duties at the State House as chief of the bureau of investigation; that he had nothing to worry about financially; that he had turned over everything he had in the way of prop-

erty to his sister and mother; that he had money to travel on and was going to take a good rest and felt quite relieved not to have the telephone ringing and anybody bothering him. This same witness related another conversation between Park Findley and his brother, John, after John had joined them at San Antonio, Texas, in which the General said that he had provided for his sister and mother by turning over his property to them. While at San Antonio, Texas, Park Findley was under the care of a nurse a portion of the time, a Miss Gladys Brown. She related a conversation which she heard between these two brothers, in which Park told his brother that "everything I have, I have given to Rieka and to my mother." She heard this talk more than once. She said the question of money came up more than once. She was then asked if she had any conversation with General Findley in which he said anything concerning his property, and she answered: "Yes, oftentimes, I read letters from his sister to him, and she was discussing—Q. What did he say? A. He said, 'I have given everything that I have to my sister; she is going to take care of things for me.'" The brother, John, related a conversation he had with his brother, and he was asked: "During your visit with Park Findley, did he make any statement to you concerning his property?" and the witness answered, "He told me he had given everything to Rieka and mother, Rieka for mother, both of them, everything he had. He wanted to know if it was satisfactory with me and I told him it was satisfactory and a fine thing for him to do, for a man in his condition."

Morris Hanson testified to a conversation which he heard between Rieka and General Findley at Peoria, Illinois, at the time Rieka had gone there to try to persuade her brother to come home. He stated in substance that Rieka thought that he had been gone long enough and might as well come back to Des Moines, and Findley answered that he didn't care to come back to Des Moines, that he had given her all of his property and he did not want the responsibility of the office over at the State House, and he wanted to take a trip, and he knew that any time that he might need some money, or anything for his own expenses, that she would give him some. On cross-examination the witness reiterated this statement and further said that Findley stated he was glad to be relieved of the responsibility and knew that he

1288

could have money to travel on, that his sister, Rieka, did furnish him money to travel on.

On April 27, 1935, checks were issued by Park A. Findley, payable to the order of Rieka Findley, for the amount of money on deposit in the two banks. These checks were delivered to her and she cashed them and deposited the money on the 30th of April, 1935, in the name of "Rieka Findley, Trustee." Park Findley continued on his journey, going to Chicago and later to Miami, Florida, where he married Miss Grace Miller on June 3, 1935, and they returned to Louisville, Kentucky, where Park Findley died on the 13th of June, 1935. The immediate cause of his death is not shown in the record.

There is no contradiction or dispute anywhere in the record of the foregoing facts. We are at a loss to see what there is here for a jury to pass upon. Certainly it was a matter for the court to determine whether the foregoing facts constituted a gift. The matters which the appellee points out as making a question for the jury, as we view the record, are without material substance. He calls attention to the signature on the orders, Exhibits A and B, and as he interprets the signature, the name Findley is spelled "Findlery" or "Findlury". There seems to be one too many letters or characters in the name, but when compared with the name on the checks there doesn't seem to be any material difference. The writing is in a very good hand. Furthermore, the orders were presented to the two banks. The bank officials knew Park Findley's signature. They did not hesitate to act upon the authority over this signature and turn over to Rieka Findley over $100,000 worth of property. Appellee also calls attention to the unusual act of turning over all of one's property at the age of sixty years, and the change in the disposition of his property from that contained in his will. In the absence of any showing of any influence interfering with the free and voluntary act of the donor in making such disposition of his property as he saw fit, these matters have no bearing on the question. Furthermore, the will was only admitted as bearing on the question of mental competency.

It should be remembered that Park A. Findley had no wife or children. His mother was his only direct heir. While his first wife was living, she and his mother were the ones to whom his property would legally descend, should they survive him. Likewise, they would be the natural objects of his bounty. That he

so considered them is shown by his will executed in 1932 before his first wife's death. By this will he gave his mother one-third of his property, and placed the remaining two-thirds in trust for his wife, with the further provision that should his wife not elect to take under the will, then she should have one-third, and the mother, if living, the remaining two-thirds. At the time he made this gift, his first wife had been dead almost two years, since which time he had made his home with his mother and his sister, Rieka. The natural object of his bounty was still his mother, and how natural to include the sister who was at home looking after her aged mother, and who had helped make him a home in recent years, and whose conduct, as disclosed by this record, is shown to have been that of a devoted sister, which devotion, care and solicitude for her brother continued to the end of his life. The gift of practically his entire property should be considered in the light of the statement made at the time, that he knew that she would let him have whatever money he needed, and the record is that she did send him money when called upon to do so, showing that his trust in her was not misplaced, and that he was not mistaken in his judgment of his sister. In this state there is no law denying a man in his situation the right to dispose of any part or all of his property during his lifetime, among such of his relatives as he may see fit, and there is nothing in this gift contrary to public policy or good morals.

The fact that in his will he included among his residuary legatees his other sister and brother and did not include them in this gift in no way tends to mitigate against the validity of a gift, and this brother and sister apparently are perfectly satisfied—at least the brother so expressed himself—and the gift as made, insofar as the donees are concerned, is a perfectly natural thing any normal man might do.

Another matter relied upon by appellee is the statement of the nurse, Miss Brown, that in one of the conversations in which Park Findley stated that he had given everything to his sister, Rieka, he added this statement: "She is going to look after things for me." The construction appellee seeks to place upon these words "look after *things* for me" is entirely inconsistent with what was actually done. If Rieka Findley was merely to manage Park Findley's affairs, it was not necessary that he surrender full dominion over his property, or that he insist that she remove the contents of the safety deposit boxes or that he turn

over to her his keys. She had keys to these boxes, but when he delivered to her a written order on the banks and surrendered his keys and insisted that she go to the banks and obtain the contents and inform him that she had possession before he started on his trip, he evidenced the clear intention of doing what he later declared on several occasions that he had done, to transfer and deliver to his mother and sister all of his property and surrender dominion over it.

In considering the reasonableness or naturalness of this disposition of his property, which appellee contends was most unnatural for a man only 60 years of age, we must take into consideration the fact that the donor was a physician and probably understood his physical condition better than anyone else, and no doubt knew that in the very nature of things, afflicted as he was, a man of his age could not expect to live and enjoy his property for any great number of years. He very probably knew that the candle which he had burned at both ends was soon to be extinguished.

Another thing which must be considered in passing on the reasonableness of the disposition made of his property is his subsequent marriage to Grace Miller. She was a trained nurse. There can be no question that she knew his physical condition. She was with him for ten days in March, 1935, in Kansas City in a sanatorium where he was being examined, and tests were being made by the physicians; yet despite this knowledge she became the wife of a man so afflicted. Just what may have been the motive prompting the making of this gift of his property to his mother and sister, before starting on his journey through the states, and before venturing upon the sea of matrimony, will remain unknown. It was his right to do as he pleased with his property, whatever the motive.

And lastly, there is this fragment of testimony from Mr. Findley's driver, Mr. Hanson, who said: "He cried quite a bit. He was not the Park Findley he used to be." Counsel, in the heat of debate, snatch this leaf from the album of this man's life and zealously draw the court's attention to it and seek to magnify these tears as evidence bearing upon the invalidity of the gift. This of course was after the gift was made. Furthermore, it should be borne in mind that this busy, active man had cast off his burdens, perhaps for the first time in his entire life, and had set out on this journey to see some of the things of interest which he had

probably always wanted to see. As a physician he undoubtedly knew that his days were numbered; that the earthly ties of affection that for sixty years had been woven into the warp and woof of his life were bound to be severed; that the camp fires were burning low and would soon flicker out, and there would be nothing left but the ashes and cold dead embers. Men, who have been masters and conquerors of every obstacle, sometimes weep when forced by failing health, political or other adversity to surrender their life's work. Ah, yes, even a strong man suddenly relieved of life's burdens, in failing health and strength, as he looks back upon the panorama of his life and gathers together upon the retina of the eye of his soul all the memories of the past, the joys and sorrows, the glories and successes, as well as the follies and failures, and sees what he once was, and now is, and realizes what he might have been—if there is anything left within him of that tenderness and sweetness of life that once caused him to yearn for his mother's arms, if there is anything left within him to cause him to want to cling to life or linger with his friends, if he can still hear the indescribable symphony of life in the world about him, if his soul is not completely dead—he will experience the pangs of heartache, and for such trying hours nature has supplied us with tears. We know not why he wept. If he had but spoken and told all he felt and all his inner vision saw, mayhap we could see something of the heroic and not so much of the ridiculous and cowardly, and could temper our judgment with mercy and sympathy.

All these matters might have more or less bearing on the question if this were a case where the establishment of the gift, the intention to make it or the delivery, dependent upon circumstantial evidence. This is not such a case. We have here express declarations of a desire and intent to give this property to his sister and mother, coupled with the execution of written orders on the banks to deliver the property to the sister, a complete relinquishment of dominion over it by the delivery of his keys to her, her subsequent taking manual possession of said property, Findley's unequivocal statements made to others that he had given all his property to his sister and mother. With knowledge on his part that he had done this and had no money of his own, at no time during the several weeks that he lived after he made the gift did he ever repudiate what he had knowingly done.

Where is there any room for doubt? Why should a jury be allowed to conjecture or speculate about this matter?

Touching the question of mental competency of the decedent to make a valid gift of his property, the record before us presents an unprecedented situation. Here was a man who for fifteen years was in active public life in the metropolis and capital city of this state, and who in the very nature of things must have been well and intimately known by literally hundreds of intelligent men and women, business men and professional men, state, county and city officials, and men connected with the National Guard from all parts of Iowa; yet not one single, solitary person of all his acquaintances was placed on the witness stand by the plaintiff in this case to give evidence concerning his actions, conduct, conversation or business transactions of any kind or character. The plaintiff, George A. Wilson, a lawyer of high standing and integrity (who brought this action not on his own application, but on the application of the woman who became Mrs. Findley only ten days prior to Findley's death), unquestionably knew Park A. Findley intimately, so intimately, in fact, that in 1932 when Mr. Findley wanted a will prepared he went to Lawyer Wilson, in which will Wilson is named as executor and whose name appears as one of the witnesses thereto. Likewise, when in May, 1935, the sister, Rieka, went to Peoria, Illinois, and sought to persuade her brother, Park, to return home, she took with her this same friend of the family, George A. Wilson. If there was anything unusual or abnormal in the everyday life and conduct of Mr. Findley, if there was any mental breakdown, any indication of failure of comprehension of business affairs, Senator George A. Wilson would have known about it. He was not placed on the witness stand.

Then there is Miss Grace Miller, the trained nurse, who married Findley, knowing of his physical condition, who testified that she had known Park A. Findley for five or six years. It is only fair to assume that this acquaintance was more or less intimate, since the record reveals that at least on two different occasions she accompanied him as his nurse and personal attendant. She was undoubtedly capable of discerning between rational and irrational conduct. She was a competent witness as to what she observed, yet while she was placed on the witness stand, her lips remained silent as to anything she observed, bearing on the mental competency or incompetency of the decedent.

In the respects just pointed out, we dare say that this case is without a parallel in the court decisions of this or any other state. With able and astute counsel representing the plaintiff (who is himself a lawyer of ability) is it not fair to assume that in the discharge of their duties to their client and parties in interest these attorneys made at least a reasonable effort to find among all the acquaintances of Mr. Findley someone who was willing to tell what they knew about this man's conduct? Even though such persons might have hesitated to voluntarily take the witness stand because of friendship or other relationship, plaintiff had the power of a subpoena with the authority of the state of Iowa behind it to compel attendance. But none—not one—was produced.

What do we find when we look at the defendant's side of the controversy on this subject of mental competency? We find an array of both lay and medical witnesses, state officials and National Guard officers, and close associates, men whose credibility and integrity stand unquestioned in this record; medical men of high standing and special training, who not only knew Findley personally for many years, but some of whom had treated him professionally, and one was associated with him in business. All were personally acquainted with him and had met him in social and official capacities. They related on the witness stand facts showing ample opportunity to observe him in all the various activities of his life and work, covering a period of many years, and some of them up to the very day the gift in question was made. They each and all testified that from their observations as to his appearance and his conduct and transacting his business they observed nothing in relation to all these matters other than the conduct of a normal man. Included among these witnesses was the Attorney General of Iowa, Edward L. O'Connor, who appointed Mr. Findley Chief of the Bureau of Investigation; Walter F. Maley, Assistant Attorney General, who had charge of criminal appeals; and Carl A. Burkman, present county attorney of Polk County, Iowa, whose term, either as assistant county attorney, or county attorney of said county extends back to the time Findley was sheriff of Polk County. These men, all connected with law enforcement in this state, by reason of their constant contact with the sheriff's office and the department of criminal investigation, would, of course, have every opportunity in the world to observe the conduct of General Findley.

Defendant's witnesses also included leading men at the head of the Iowa National Guard, Gen. Charles H. Grahl, Adjutant General of the state of Iowa, and his assistant Gen. R. A. Lancaster, Major Frank E. Bigelow, Col. Joseph C. King of the United States Army Cavalry, a graduate of West Point detailed by the War Department as instructor of Cavalry in the Iowa National Guard, Capt. Ellis W. Conkling, commanding Headquarters Troop, 113th Cavalry, Glen L. Schmidt, who not only met Findley at camp schools and conferences, but was one of the state agents under Mr. Findley in the department of criminal investigation. These men related their special opportunities to observe him through association with him in their service, attending drill and schools of instruction and working out army problems, in which Findley took part, even up to within a few days of the time this gift was made, and they all told the same story. They saw nothing to indicate that he was other than a man of normal faculties and of sound mind.

There was testimony by four eminent physicians, Dr. F. R. Steelsmith, who had known Park Findley for 30 years; Dr. N. B. Anderson, physician and surgeon, a graduate of the University of Iowa, University of Edinburgh, Scotland, University of Vienna, Austria, who had been in active practice of medicine in Des Moines since 1922 and had known Park Findley since 1920, and since 1930 had been quite closely associated with him in the National Guard, he being commander of the Medical Detachment of the 113th Cavalry, and who had last seen Gen. Findley on the 1st of April, 1935, and had a long conversation with him. Dr. E. A. Hunt and Dr. R. C. Doolittle, located at Hill's Retreat, 28th and Woodland Ave., Des Moines, Iowa, who had occasion to observe Gen. Findley from the 6th of April until the 9th of April, 1935, during which time Findley was at their institution for rest. They made a general examination of him and observed him while there. These trained men took the witness stand and all testified from personal knowledge gained in the manner indicated that they saw nothing to indicate unsoundness of mind, that his acts and conduct were those of a normal man and they believed him to be of sound mind at the time or times they observed him.

In opposition to this array of witnesses touching the mental competency of the decedent, the plaintiff produced Dr. Duncan of Kansas City, Missouri, who has charge of a sanatorium at that

place. On March 5, 1935, Findley entered this sanatorium where patients go for treatment who are afflicted either with the drug or alcoholic habit. He was there ten days for treatment for the morphine habit, during which time numerous laboratory tests were made, which are all described in his testimony, and from these examinations and tests he testified that Findley was afflicted with syphilis which had caused paresis. He described the germ that causes this mental disease and told how it attacks the covering of the brain and the brain itself and goes on to where it causes this condition known as paresis, operating, as he states, to bring about destruction of the brain and brain mentality, or brings about a mental deterioration. Dr. Duncan described Findley's appearance when he was brought to the institution, supported by a nurse as he came into the hospital, who looked after him and assisted him in dressing and undressing. He noticed some defects in memory, said he would talk about things and then the next time he would not remember whether he had told him about those things at all, he would get muddled at times. He was cloudy at times in reference to things that were happening, or in reference to his treatment and to other things. Whether this was the result of the paresis or the withdrawal of the drug is not made clear. Certainly the doctor's testimony does reveal the fact that he talked to Findley concerning his affliction, that he got the history of the case from him. Findley told him that he had seen an advertisement in a medical journal concerning treatments for the drug habit, and that he came down for that purpose. He told the doctor how he acquired this addiction to morphine, and after he was there awhile the doctor tried to get him to remain longer. The doctor's testimony shows that Findley asserted his legal rights, that his will power was still dominant, he knew what he wanted and was still master of himself and capable of going where he wanted to go and doing what he wanted to do. He told the doctor that he had a friend who was a doctor in Des Moines, to whom he could go for treatment, and that he had some important business to transact. The doctor didn't want him to leave and tried to persuade him to stay, but Findley went. The doctor seemed to place considerable emphasis on the fact that this patient of his wore a gold badge upon which was inscribed Department of Justice. He said he told fantastic stories about trailing criminals across the country. The doctor said he didn't know he had been sheriff of Polk County and was

actually the chief of the Bureau of Criminal Investigation of Iowa, didn't know anything about his record as sheriff of Polk County or in the department, but when asked whether had he known this he would still have believed the stories to be fantastic, he revealed somewhat his partisan spirit by replying, "Yes, in the way he told it." Yet there isn't a particle of evidence in the record that these stories he told were not true.

Based upon Dr. Duncan's testimony, two other eminent physicians and specialists in psychiatry, Dr. A. R. Stewart of Independence State Hospital and Dr. R. D. Smith, superintendent of the Clarinda State Hospital, in answer to a hypothetical question in which was included the result of the laboratory tests and the testimony of Dr. Duncan and some other matters, including the manner of the disposition of his property by will in 1932, and other matters heretofore referred to, testified that in their judgment and opinion Findley was of unsound mind on the 8th of April, 1935, Dr. Stewart saying that this condition had been of long standing, and Dr. Smith saying that it had been coming on for some little time. Nowhere in the testimony of Dr. Duncan or of these two opinion experts is there any attempt to state the degree of the mental impairment brought about by this disease, or to state the effect such impairment would have upon the patient's ability or competency to comprehend or understand the extent of his property and the disposition he desired to make of it, the objects of his bounty, etc. Mental weakness due to disease does not deprive one of capacity to dispose of his property until it has progressed to the extent that the power of intelligent action has been destroyed. Bishop v. Scharf, 214 Iowa 644, 652, 241 N. W. 3. This burden was on the plaintiff. In our opinion he failed utterly to meet it.

As we stated at the beginning of this opinion, paresis, being a form of insanity which is of permanent character, would be presumed to continue, and in the absence of any evidence that there was any change for the better from the time that he made the gift on April 8, 1935, until April 27, 1935, when he made a check to his sister for the money on deposit, and the jury having found that he was competent on the later date, it would seem to be rather conclusive against the appellee's contention that he was incompetent to make a gift of the contents of the safety deposit boxes. But aside and apart from the finding of the jury, we are abidingly satisfied that there is no evidence in this case

to show that Park Findley's mental impairment or unsoundness of mind had reached that degree which incapacitated him from making a valid gift of his property, and that being the case, the motion to direct a verdict in appellant's favor should have been sustained. Re Estate of Fitzgerald, 219 Iowa 988, 259 N. W. 455. Neither contracting nor testamentary capacity requires entire soundness of mind. Jones v. Schaffner, 193 Iowa 1262, 188 N. W. 787. All paretics are not incapacitated to intelligently transact business. In the case of Rickman v. Houck, 192 Iowa 340, 347, 184 N. W. 657, 660, the court in the opinion quoted from the testimony of one of the medical experts on this subject as follows:

"I would not say that a paretic was insane previous to the time it manifested itself in excitement and extreme nervousness. We have had paretics who conducted battles in the navy that have settled questions of international import. I have had paretics under my own observation that have bought and sold large stocks of goods," etc.

■■■ The rule in this state with reference to the court directing a verdict is not whether there is literally no evidence, but whether there is any evidence which ought reasonably to satisfy the jury that the fact is established. 64 C. J. page 302, par. 317.

In the case of Bales v. Bales, 164 Iowa 257, at page 275, 145 N. W. 673, 680, this court made the following pronouncement:

"The rule governing the court in the disposition of a motion for a directed verdict at the close of the evidence is that it is not the duty of the court to submit the case to the jury because there is some evidence introduced by the party having the burden of proof, unless that evidence is of such a character that it would warrant the jury in finding a verdict in favor of the party introducing such evidence. Before the question is left to the jury for its determination, the preliminary question for the court is whether there is any evidence to support the verdict, and if so, whether upon such evidence the jury can find a verdict for the party producing it that will stand. * * * It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence in support of the case, but it is now settled that the question for the judge is, not whether there is literally no evidence, but whether there is any that ought reason-

ably to satisfy the jury that the fact sought to be proved is established. * * * 'Our conclusion is that when a motion is made to direct a verdict, the trial judge should sustain the motion when, considering all of the evidence, it clearly appears to him that it would be his duty to set aside a verdict if found in favor of the party upon whom rests the burden of proof.' ''

This rule announced in Bales v. Bales, 164 Iowa 257, 145 N. W. 673, was reiterated by this court in the recent case In re Will of Diver, 214 Iowa 497, at page 509, 240 N. W. 622.

The evidence in the Bales case and in the Diver case of unsoundness of mind was far stronger than in the instant case, and in the Bales case this court, after reviewing the evidence stated that a verdict for the contestants would not have support in the evidence sufficient to maintain a verdict in their favor based thereon. In the Diver case at the close of all the testimony the court sustained proponent's motion for directed verdict in her favor, and this court said, after reviewing the evidence and the authorities, 214 Iowa 497, at page 511, 240 N. W. 622, 628:

"Upon the whole case, there is not sufficient evidence on behalf of the contestants to carry the case to the jury. Any verdict which might be returned in favor of the contestants must necessarily be set aside for want of proper support in the evidence.''

In both of said cases the record showed mental deterioration and impairment of the brain itself, and the medical experts in answer to hypothetical questions gave it as their opinion that the testator was of unsound mind. Many other cases might be cited along the same line, but these two are especially mentioned because of the presence in the record of the evidence of medical testimony, and for the purpose of showing that in this state, the fact that medical experts in answer to hypothetical questions state that a person is of unsound mind does not necessarily make a jury question. Without in any way intending to minimize the value of scientific investigation, or to cast any aspersions upon the medical experts, we think it must be said that to warrant a court or jury in overthrowing one of the most important acts of a man's life—that of disposing of his property as he wants it to go—there should be something more than the mere results revealed by a laboratory test tube. These tests are, of course, in-

valuable in determining the absence or presence of syphilis or paresis. Manifestly, the question of whether the disease had progressed to the stage of mental impairment which incapacitated its victim in the transaction of the business in hand would not be disclosed by the test tube, and could only be determined from his acts and conduct.

In both the printed and oral arguments, much time was devoted to the subject of burden of proof, and we perhaps should state our conclusion with reference to this matter. Being a suit in replevin, the gist of the action was the immediate right of possession, and the burden was on plaintiff to establish this, and this burden remained upon the plaintiff throughout the trial. Courtright v. Deeds, 37 Iowa 503; Hamilton v. Iowa City Nat. Bank, 40 Iowa 307; Peake v. Conlan, 43 Iowa 297; Cumberledge v. Cole, 44 Iowa 181; Wallace v. Wallace, 62 Iowa 651, 17 N. W. 905; Hillman v. Brigham, 110 Iowa 220, 81 N. W. 451.

Under the defendant's general denial, any evidence tending to negative plaintiff's right to possession was competent; hence he was entitled to introduce evidence of gift under general denial. Whitaker v. Sigler, 44 Iowa 419; Gardner & Butters v. Builders Material Co., 190 Iowa 443, 180 N. W. 188; Conway v. Alexander, 200 Iowa 705, 205 N. W. 351.

Counsel for appellee made a strenuous effort to force the defendant into a position which would cast the burden upon her, but defendant's counsel refused to be drawn into the net, and nowhere in their pleadings did they set up an affirmative defense, and appellee's contention that there was a voluntary paper issue is not sound. There can be no affirmative paper issue of gift if evidence of gift is admissible under the general denial. The effort of appellee to force the appellant into a position where she would be compelled to take the affirmative, or where the burden of final persuasion would be upon her, was to bring the case within the rule of Roberts v. Morse, 190 Iowa 1344, 181 N. W. 678, but that case is distinguishable. In that case there was an affirmative defense of gift, and the defendant did assume the burden. This was also true in the case of Adamson v. Harper, 162 Iowa 56, 143 N. W. 844.

The phrase "burden of proof" has two meanings, one to express the idea that a named litigant must in the end establish a given proposition in order to succeed; the other, to express the idea that at a given stage in the trial it becomes the duty of a

certain one of the parties to go forward with the evidence. Vol. 1, Words & Phrases (3d Series) 952; Hansen v. Oregon-Washington R. & Nav. Co., 97 Ore. 190, 188 P. 963, 969, 191 P. 655.

This matter is thoroughly discussed by our own court in the case of Gibbs v. Bank, 123 Iowa 736, at page 742, 99 N. W. 703, 706, wherein it is stated:

"It is clearly a misnomer of terms to say that the burden of proof swings like a pendulum from one side to the other during the progress of a trial. All that is meant is that the duty of introducing evidence to meet a prima facie case shifts back and forth."

See, also, Brogan v. Lynch, 204 Iowa 260, at page 262, 214 N. W. 514. This matter is quite ably discussed in 1 Am. Jur. page 764 in connection with the subject of advancements, and is quoted with approval in In re Wiese's Estate, 222 Iowa 935, 270 N. W. 380.

 There is also much said in argument with reference to the effect of presumptions; but presumptions have little place in a case such as we have here, where eyewitnesses related what was said and done. Presumptions disappear in the light of actual facts. See Brogan v. Lynch, supra.

 The evidence is so clear and unequivocal on the question of gift and is entirely undisputed and the jury having in effect found that the donor was mentally competent, we are of the opinion that this record presents a situation where the court should not only reverse, but should direct the trial court to enter judgment sustaining appellant's motion for a directed verdict at the close of all the testimony. This is not an appeal alone from an order overruling a motion for new trial, but the appellant contested every step of the road and took exceptions to the court's ruling at every stage of the proceedings; in overruling her motion to direct at the close of plaintiff's testimony, and in overruling a similar motion at the close of the plaintiff's testimony in rebuttal, and at the close of all the testimony. Under the provisions of section 12871 of the Code, the court may reverse, modify, or affirm the judgment, decree, or order appealed from, or render such as the inferior court should have done. See Stoner v. Ins. Co., 220 Iowa 984, 263 N. W. 46, and cases therein cited. The appellee presented his case. He was not denied the introduction of any evidence offered. There is nothing to indi-

cate that the evidence on a new trial on the question of gift would or could be other than as set out in this record. Plaintiff sought to base this case entirely upon the expert medical testimony. This evidence having been held insufficient by this court upon which to base a verdict, it is only just and proper to direct the trial court accordingly. Any other rule is an invitation to an unscrupulous litigant to produce even false testimony on retrial to take the case to the jury. Each party has had his day in court, has fully tried his case, has all the facts before the court necessary to determine the case, and the case should be determined on this record.

The case is accordingly reversed and remanded with instructions to sustain the appellant's motion to direct a verdict in defendant's favor, and enter judgment against the plaintiff for costs.—Reversed and remanded with instructions.

DONEGAN, PARSONS, ANDERSON, STIGER, and SAGER, JJ., concur.

MITCHELL and RICHARDS, JJ., dissent.

MITCHELL, J. (dissenting)—I cannot concur in that part of the opinion which orders the trial court to direct a verdict in favor of the defendant. This is a law action and upon re-trial the evidence may be entirely different, and this court should not pass final judgment until the new record is perfected.

I am authorized to state that Justice Richards joins in this dissent.